[L. A. No. 5025. In Bank.—October 1, 1918.]

## J. C. ALLEN et al., Petitioners, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

PUBLIC UTILITIES—WATERS AND WATER RIGHTS—PUBLIC USE—DEDICATION.—Where there was no intention to vary the original plan to apply waters to land which the managers of an enterprise had for sale, with which sales water certificates were also sold entitling the purchasers to a certain amount of water per acre, it being intended to sell water to none other than purchasers of the land, except to the extent of any incidental surplus, the fact that in a certain year prior to the execution of a large number of the water certificates about fifty per cent of the water supply was sold to persons who were not owners or purchasers of any part of the land to which the water was intended to be applied, does not show an intention to dedicate this portion of the water to public use, these sales of water being made solely because that year was one of extreme drought in that vicinity, and as a temporary relief for that time only to outside lands which would otherwise have suffered great damage from the failure of their usual water supply.

ID.—PROPERTY AFFECTED WITH PUBLIC INTEREST — INAPPLICABILITY OF PRINCIPLE.—The principle of the case of *Munn* v. *Illinois,* 94 U. S. 113, that property "affected with a public interest" is no longer private property and is subject to public regulation, does not apply to water sold with lands for use upon the land and as an appurtenance thereto in the manner shown in the present case, and the fact that parties holding separate water rights, each upon his own land,

are numerous, does not convert their several private uses into a public use.

ID.—WATER DISTRIBUTING SYSTEM—EASEMENT.—A water distributing system is a species of real property, and the right of the land owner to receive water not devoted to public use upon the land for its benefit, from an outside source, through a system of canals or pipes for conducting it to the land, is an easement attached to the land and a corresponding servitude upon the source of supply and the distributing system, the easement and the servitude constituting a single entity, one of which cannot be separated from the other without destroying both.

ID.—CONTRACT FOR WATER—FIXING RATE.—Where a contract for water fixes the rate, not only for the water as such, but also for its delivery, that is, for the use of the system for that purpose, to raise the rate without consent of the land owner would impair the obligation of the contract, and, so far as the increase inured to the benefit of the public use by other water through the same system, it would be taking the private property of the contract holders for public use without compensation.

ID.—POWER OF RAILROAD COMMISSION.—The fact that water rates fixed by contracts are too low and that the water company will be unable to go on with the service, either to the public utility serving a certain town, or to the contract holders, unless both shall pay more for the service, does not give the Railroad Commission the power to interfere and fix the rates.

ID.—PUBLIC UTILITIES ACT—FINDINGS OF RAILROAD COMMISSION—JURISDICTION.—The declaration of section 67 of the Public Utilities Act of 1915 that "findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review" has to do with the commission's determinations upon questions of fact within its jurisdiction; but when the question, one of mixed law and fact, goes to the jurisdiction itself, the controversy being as to whether or not a corporation is a public utility, the commission's determination is subject to review.

ID.—JURISDICTION OF SUPREME COURT.—The supreme court may by mandate compel the Railroad Commission to exercise powers which it possesses, and it may also restrain it from exercising powers which it does not possess, or annul its decrees when such unwarranted powers have been exercised.

ID.—SUPPLYING CITY WITH WATER — PUBLIC SERVICE.—When a water company engages to supply a town site and a succeeding city built upon it with water for municipal and domestic purposes and proceeds to do so, it becomes a public service corporation, at least in so far as the needs, present or future, of the growing city are concerned, but it does not follow that it thereby dedicates all of its water to public use.

ID.—PRIVATE WATER COMPANY.—A private water company may be organized to sell water for purposes of private gain and not in so doing become a public utility; and a company having a single and undivided supply of water may devote its properties and a part of those waters to public service and may retain a part for the advantages of private sale, and not become a public service corporation as to all by virtue of the dedication of a part.

ID.—SUBMITTING TO RAILROAD COMMISSION.—A water company does not become a public utility merely by its fixing the rates and charges for the water which it sells, nor can its submission to the jurisdiction of the Railroad Commission and its declaration that it is a public utility affect previous invested rights of parties who have contracted with it for the purchase of water.

ID.—PRIVATE AND PUBLIC SERVICE COMPANIES.—While a public service corporation cannot out of its waters impressed with a public use sell private or preferential water rights, a private corporation can and may.

ID.—ARTICLES OF INCORPORATION—DECLARATIONS OF PURPOSES.—The purposes avowed in articles of incorporation do not fix the character of the corporation in its future activities as being a public service corporation; such declarations of purposes merely serve to give the corporation capacity to engage in such public service if it shall so desire.

ID.—SALE OF WATER—CONSTRUCTION OF CONSTITUTION.—Article XIV of the state constitution was intended to regulate the use of water appropriated and dedicated generally for sale and distribution among an indefinite number of users, but was not intended to declare that a single sale of a part of his water by one having more than he needs would convert the use into a public use in which others could share. The section must be understood to apply to the cases where one has appropriated water generally for sale, rental, or distribution, and not to cases where sales are made to particular persons at a fixed price by ordinary contracts to purchase and sell.

ID.—DEDICATION TO PUBLIC USE—PRESUMPTION.—Dedication of property to public use is never presumed without evidence of unequivocal intention.

ID.—WHAT CONSTITUTES PUBLIC UTILITY.—To constitute a public utility the devotion to public use must be of such character that the public generally, or that part of it which has been served and which has accepted the service, has the right to demand that that service shall be conducted, so long as it is continued, with reasonable efficiency under reasonable charges. Public use means the use by the public and by every individual member of it, as a legal right.

ID.—CONSTRUCTION OF CONSTITUTION AND STATUTES.—Our constitution, and our statutory definitions of public utilities must be construed as applying only to such properties as have in fact been devoted to a public use, and not as an effort to impress with a public use properties which have not been devoted thereto.

PROCEEDING for a Writ of Review originally taken in the Supreme Court to annul an order of the Railroad Commission of the State of California fixing certain water rates. Order annulled.

The facts are stated in the opinion of the court.

E. E. Keech, and Henry Goodcell, for Petitioners.

Douglas Brookman, and Max Thelen, for the Railroad Commission.

Oscar Lawler, and James E. Degnan, for Lake Hemet Water Company.

Short & Sutherland, and L. L. Cory, *Amici Curiae.*

SHAW, J.—Upon further consideration of this case we adhere to the opinion prepared by Mr. Justice Henshaw and rendered by the court upon the original submission. Some additional treatment of points discussed upon the rehearing is appropriate.

The principal reason for the order granting a rehearing was the desire of the court to re-examine the evidence upon the question of fact whether the Lake Hemet Water Company, at the time it executed to the respective petitioners the water contracts held by them, had dedicated to public use the water which the company thereby agreed to sell and deliver to the holders of the contracts, or whether these contracts were made without such dedication and in each case for the private advantage of the parties contracting. Further examination on this point has satisfied us that our original conclusion was correct. The water was held in private ownership, it had not been dedicated to public use at the time these several contracts or water certificates were executed, and the right thereby vested in the land owners to whose land the water was thereby made appurtenant was private property.

In the subsequent briefs emphasis is laid on evidence to the effect that in the year 1898, prior to the execution of a large number of the water certificates in question, the Water Company sold to persons who were not owners or purchasers of any part of the land to which Whittier and his associates intended the water to be applied, an amount of water equal

to fifty per cent of its supply for that year. This, it is claimed, was in effect a dedication of that proportion of the water to public use. It is plain from the evidence in the case that these sales were not made with the intent to dedicate that water to public use. They were made solely and only because that year was one of extreme drought in that vicinity and as a temporary relief for that time only, to outside lands which would otherwise have suffered great damage from the failure of their usual water supply. There was no intention to vary the original plan of applying the water to the land which the managers of the enterprise had for sale and to none other, except to the extent of any incidental surplus.

In the argument by the attorneys for the commission great reliance is placed on the decision in *Munn* v. *Illinois*, 94 U. S. 113, [24 L. Ed. 77], and especially on the phrase "affected with a public interest," used in the opinion. This case and this phrase is frequently invoked to advance the idea that the general interest of the state in the welfare and prosperity of its citizens is a sufficient basis for the right of the state to regulate prices for the use or sale of private property. Because of the use of this phrase the case itself is misunderstood. The phrase was used in quotations from the old English authorities declaring that there could be public regulation of the tolls to be taken by millers for grinding grain. These millers, having invited all persons to bring their grain to the mill to be ground and having thus established a business, sought to increase the tolls, or to favor some customers above others, and claimed the right to do so. It was held that having thus dedicated the mill to this public use, the public had a right, or interest in it, and in describing this right it was said that when property was thus "affected with a public interest" it ceases to be exclusively private property. So with the great grain elevators involved in the Munn case, which, by the development of modern commerce and steam machinery, had become established as an adjunct to railroads, though managed by others, and were practically the only means of shipping grain on the railroads, it was said that they, too, as well as the ancient English mills, had become "affected with a public interest"; and were, therefore, no longer private property only, and were subject to public regulation. The parallel is obvious, but it does not apply to water sold with land for use upon the land and as an appurtenance thereto

in the manner shown in the present case. The fact that the parties holding separate water rights, each upon his own land, are numerous, does not convert their several private uses into a public use.

There is no ground for the claim that the water distributing system used by the Water Company can be considered as a thing separate from the right to receive water and declared to be a separate and public service, the rates for which, as to these petitioners, can be fixed by the Railroad Commission, and made to exceed the rates specified in the water certificates. The distributing system is a species of real property. (*Stanislaus Water Co.* v. *Bachman,* 152 Cal. 726, [15 L. R. A. (N. S.) 359, 93 Pac. 858].) The right of a land owner to receive water not devoted to public use upon land for its benefit, from an outside source, through a system of canals or pipes for conducting it to the land, is an easement attached to the land and a corresponding servitude upon the source of supply and the distributing system. (*Copeland* v. *Fair View Land & Water Co.,* 165 Cal. 154, [131 Pac. 119]; *Palermo Land & Water Co.* v. *Railroad Commission,* 173 Cal. 380, 386, [160 Pac. 228].) The easement and the servitude constitute a single entity and the one cannot be separated from the other without destroying both. The petitioners have property interests in the distributing system, by reason of these easements and servitudes. The contract fixed the rate, not only for the water as such, but also for its delivery, that is, for the use of the system for that purpose. To raise the rate without consent of the land owner would impair the obligation of the contract, and, so far as the increase inured to the benefit of the public use of other water through the same system, it would be taking the private property of these petitioners for public use without compensation.

It may be that the rates fixed by the contracts with petitioners are too low and that the company will be unable to go on with the service, either to the public utility serving the town of Hemet or to the petitioners, unless both shall pay more for the service. That will demonstrate that the contracts which the Water Company voluntarily made for disposition of its own property were improvident and unwise. But that does not give the Railroad Commission power to interfere, however desirable such interference might be if the

power were wisely exercised. It is not the guardian of those who do not wisely manage their property.

All the other points that are material or important to the decision of this case are fully and adequately treated in the former opinion. It leaves nothing more to be said and we adopt it as the opinion of the court.

"The Lake Hemet Water Company, a corporation, hereinafter called the applicant, petitioned the Railroad Commission to fix the rates to be charged and collected by it for the sale and distribution of water, asserting itself to be a public service corporation. Some three hundred or more land owners receiving water under contracts from the applicant appeared and made objection, insisting that so far as their water and water rights were concerned, these rights were held in private ownership, and that, as to them at least, the applicant was not a public service corporation, and jurisdiction to fix the rate charges for such water was therefore not in the commission. The commission heard evidence, made its finding and decree by which it was declared that the applicant, as to all of its corporate functions, was a public utility, and thereupon fixed water rates. From this determination the aggrieved land owners sought and obtained this writ of review.

"This review is held under section 67 of the Public Utilities Act of 1915. It is plain, and indeed it has in effect been decided, that the declaration in that section that 'findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review, has to do with the commission's determinations upon questions of fact within its jurisdiction. When the question, ever one of mixed law and fact, goes, as here, to the jurisdiction itself, when the whole controversy revolves around the inquiry as to whether or not the corporation is a public utility, to say that the determination of the commission upon this matter is final and conclusive and is not subject to review, is the equivalent of denying to a petitioner a hearing upon a right carefully preserved to him by the language of section 67 itself—a hearing and a determination of whether the order and decision under review 'violates any right of the petitioner under the constitution of the United States or of the state of California.' So it will be found that in such petitions as *Pacific Tel. & Tel. Co.* v. *Eshleman,* 166 Cal. 640, [Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652, 137 Pac. 1119]; *Del Mar Water etc. Co.* v. *Eshleman,* 167 Cal.

666, [140 Pac. 591, 948]; *Title Guarantee etc. Co.* v. *Railroad Commission,* 168 Cal. 295, [Ann. Cas. 1916A, 738, 142 Pac. 878]; *Marin Water etc. Co.* v. *Railroad Commission,* 171 Cal. 706, [Ann. Cas. 1917C, 114, 154 Pac. 864]; *Atchison etc. Ry. Co.* v. *Railroad Commission,* 173 Cal. 577, [160 Pac. 828]; *Western Assn. etc.* v. *Railroad Commission,* 173 Cal. 802, [162 Pac. 391], this court has uniformly and without a dissenting voice investigated every complaint where the petitioners upon reasonable grounds asserted that the commission had either exceeded its jurisdiction or refused to exercise the jurisdiction which in law it possessed. In the last-cited case the commission, believing it did not have jurisdiction to entertain the application of the petitioner, refused to do so, and this court, reviewing its powers, held that it did possess this jurisdiction and issued mandate to the commission to exercise it. The converse of this proposition must be equally plain. If this court by mandate may compel the commission to exercise powers which it does possess, upon the other hand it may restrain the commission from exercising powers which it does not possess, or annul its decree when such unwarranted powers have been exercised.

"Thus we are brought to a consideration of the evidence upon which the commission acted in holding this plaintiff to be *in toto* a public service corporation. The evidence, consisting for the most part, and indeed so far as value is concerned, wholly of undisputed record and written facts, is without substantial controversy. And indeed it may be added that the pure findings of fact set forth by the commission are not seriously disputed, petitioners' grievance arising over the conclusion—one of mixed law and fact—that the applicant is wholly a public service corporation.

"Into a Mexican rancho, the San Jacinto Viejo, flows the San Jacinto River. This rancho was partitioned between Estudillo, Stone, Jordan, and others. The allotments to the named persons did not border on the stream; but the partition judgment provided that each of these and their successors should have a right of way for a ditch, flume, or aqueduct across the lands of intervening owners for the purpose of securing and using upon equal terms with the owners of all other allotments their due proportion of the waters of the San Jacinto River for irrigation and other purposes in connection with their land. In 1886 the Fairview Land & Water

Company was the owner of that portion of the rancho whereat the river entered. In that same year W. F. Whittier and his associates acquired certain rights and asserted certain claims to the waters of the river, and secured a contract from Estudillo for the sale to them of three thousand acres of his land. The following year Mr. Whittier and his associates simultaneously organized two corporations under the laws of this state—the Hemet Land Company and the Lake Hemet Water Company. These two corporations were in all essentials under identical ownership and control, with the same stockholders, boards of directors, offices and letter-heads. From time to time Mr. Whittier acquired the interests of his associates and at the time of this hearing in January, 1916, he was the sole and real owner of both corporations, owning all of the stock in equity and all of the stock in law, saving a few shares outstanding and used to qualify the members of his directorates. Sixty per cent of the stock of the Lake Hemet Water Company was originally issued to Mr. Whittier and his associates in consideration of their transfer to the corporation of their interests in the land along and adjacent to San Jacinto River and of their water, water rights and claims to water pertaining thereto, and, in addition, of similar rights and claims to the waters of South Fork, North Fork, and Strawberry Creek, tributaries of the San Jacinto River. To the Hemet Land Company they conveyed their interests in the lands of Estudillo, Stone and Jordan which they had acquired, and under the ownership of the Hemet Land Company these lands became known as the Hemet tract. In 1887 Mr. Whittier caused the survey of these lands to be made and recorded. It was known as the 'map of the lands of the Hemet Land Company and of the three thousand acre Estudillo tract.' This map was adopted by the Hemet Land Company. Upon it a town site embracing 160 acres was delimited and the Hemet Land Company dedicated the streets and avenues thereon designated and named to public use, reserving therefrom, however, certain rights of way for street-cars, steam cars, telegraph lines, sewers, gas conduits, 'flumes and water-pipes for domestic use or irrigation purposes.' During this year also the Lake Hemet Water Company and the Fairview Land & Water Company adjusted and settled their conflicting claims to these waters, as will be found adequately set forth in *Copeland* v. *Fairview Land & Water Co.,* 165 Cal. 148,

[131 Pac. 119].  The Lake Hemet Water Company in this
year carried a pipe-line into this 160-acre tract where the town
or city of Hemet now is and established a public watering-
trough therein.  Aside from the question of dedication, this
was the first actual devotion to public use of any of the
waters of the company.  Lots were sold in the town site,
homes and other structures erected and the applicant supplied
them with water from its system.  In 1891 the applicant
began the construction of the Hemet dam on South Fork and
completed it in 1895, and contemporaneously constructed a
diverting, transmitting and distributing system to deliver
water for irrigation and domestic purposes to, and was at the
time of the hearing delivering water upon practically all of
the lands as shown on its official map.

"If it has not already become apparent it soon will be, that
so far as Mr. Whittier and his associates are concerned, this
was a purely private business venture for purposes of legiti-
mate private gain.  Vast areas of land in Southern Cali-
fornia are valueless (except for grazing purposes) unless
artificially supplied with water.  Because of this, two methods
of meeting the exigencies arose and both came into common
use, the one the method whereby certain land owners asso-
ciated themselves together and expended money in securing
water to be used on their own lands, forming for this purpose
a mutual water company; the second, the method here put in
practice, whereby men of means—for only men of means
could do this thing—secured tracts of land at almost nominal
prices (because the land without water had so little value)
upon which lands they knew or believed they could put water.
They then developed their water system and advertised the
lands with appurtenant water rights for sale at a greatly en-
hanced price.  The latter was the method here adopted by
Mr. Whittier and his associates.  In some of the minor details
these companies moved along different plans.  In their essen-
tials, however, the methods were the same.  Sometimes with
the land went proportionate shares of water stock to the pur-
chaser, entitling him to the use of a given amount of water
on his land.  Sometimes the land and water rights were held
by a single corporation and the conveyance of the land in ex-
press terms carried with it the right to the use of a given
*quantum* of water.  Mr. Whittier and his associates soon after
the official map of the Hemet Land Company was approved

began to advertise and sell these lands, and the practice is set forth in the finding of the commission as follows:

" 'The testimony shows that with possible minor exceptions all water regularly sold by petitioner for irrigation (as distinguished from "extra water") was sold to persons who are owners of water right certificates issued by petitioner. Under the plan originally formulated by Mr. Whittier and his associates, owning both Hemet Land Company and Hemet Land & Water Company, whenever a parcel of land was sold by Hemet Land Company, the purchaser of such land desiring water thereon was obliged to purchase a water right certificate from Hemet Land & Water Company. Later, when other lands were purchased by Mr. Whittier and his associates, in addition to the original Hemet Tract, a similar arrangement was made. The Land Company sold the land and the Water Company sold so-called "water certificates." These certificates entitled the holder to one miner's inch of water for eight acres of land.'

"On the average these land purchasers paid $75 per acre for their land and $75 per acre for their water rights appurtenant to their land. The company issued prospectuses in 1887, 1902 and 1906, each prospectus in similar language declaring that 'Each purchaser of land in the Hemet Tract is provided with a contract calling for both a domestic and irrigation supply of water. Domestic water is free during the irrigation season, and $1 per month for each family the remaining five months. The irrigation supply costs $2 per acre per annum. Each acre of land under this contract is entitled to one-eighth of a miner's inch of water continuous flow during the irrigation season. That is the water right is inseparable and is only transferable with the land.' These water right certificates contained a binding obligation upon the Water Company to deliver to the purchaser a constant flow of one inch of water for each eight acres on his designated land during the irrigation season, with a right to cumulate the water, under such regulations as would best subserve the interest of all parties. The purchaser agreed to pay and did pay the $75 per acre, or such other sum as might have been designated in the contract for this water right, and the further sum of $2 per acre while the contract remained in force. The use of the water was limited to described land. Provision was made for the use of water for

domestic purposes as above outlined.    The contract bound all
assignees or successors in interest, but could not be assigned
by the purchaser without the written consent of the Water
Company.    At the time of the hearing these water right cer-
tificates covered 69 acres at an annual rate of $5 per acre
and 5,874 at an annual rate of $2 per acre.    The applicant
also announced special rates, whereby the owners of these
water right certificates could, when the quantity of water
which the applicant possessed justified it, secure extra water
for irrigation at fixed rates, measured by the California
miner's inch for all excess water above that provided for in
the water certificates—ten cents an inch when there was a
large abundance of excess water, twenty-five cents an inch
when there was an abundance of water immediately preced-
ing the opening of the regular irrigation season, April 14th,
and fifty cents an inch during the period of the irrigation
season proper.

"The quantity of water which can be supplied by the appli-
cant is limited.    Of that 'net, safe yield,' not to exceed three
per cent and perhaps but one and a half per cent is actually
required and used by the city of Hemet.    All the rest of this
'net, safe yield' is used under these water certificates, and
after such use there is a protective remainder of water
amounting to but three or four per cent of the total supply.
This, of course, takes no account of excess waters which, being
occasional, are not to be depended upon.    Thus approxi-
mately ninety-four per cent of the waters of applicant are
devoted to use under its water right certificates, three per
cent in supplying the needs of the municipality and citizens
of the city of Hemet, while the remaining three per cent
remains in storage.

"The articles of incorporation of the Lake Hemet Land &
Water Company declared the purposes of the corporation to
be 'to acquire by purchase and appropriation water and water
rights and to develop water and to use, hold and enjoy the
same . . . and to acquire all other and further easements
necessary for the storing, conveyance, use, sale and other dis-
posal of such water in the county of San Diego and elsewhere
in the state of California; and to construct dams, reservoirs,
flumes and ditches and other conduits for the storage and
distribution thereof; and to supply the inhabitants of the

towns in San Jacinto Valley with pure water for domestic purposes.'

"The petition of applicant to the Railroad Commission to fix its water rates upon the asserted ground that it was a public service corporation was based upon the allegation that the remuneration which was received by the applicant from the existing rates was wholly inadequate. In brief, the time had come when the applicant, Mr. Whittier, concluded that the duty was an onerous one and he sought a repudiation of these contracts and water right certificates upon the ground, unquestionably sound in law, that if the corporation which entered into the contract was, at the time of entering, a public service corporation, these contracts were subject to modification at the instance of the commission. (*Southern Pacific Co.* v. *Spring Valley Water Co.*, 173 Cal. 291, [L. R. A. 1917E, 680, 159 Pac. 865] ; *Limoneira Co.* v. *Railroad Commission*, 174 Cal. 232, [162 Pac. 1033].) Certain facts in addition to those above set forth were presented to the commission. Beginning with the year 1912, in response to a general order issued by the commission to all public utilities, this applicant filed its schedule of rates, rules and regulations for the service of water for irrigation and domestic use and did so each year thereafter. The applicant further recognized its own character and the jurisdiction of the commission by making an application before it for an order authorizing the sale of certain of its properties. No doubt can be entertained but that from 1912 Mr. Whittier, who as the sole owner of these corporations may be indifferently regarded with the Water Company itself as the applicant, did all that lay in his power to declare the company to be a public service corporation and to destroy the water rights of these petitioners, for which water rights he had received the sum of $438,938.60. The next series of facts presented to the commission comes, first, from the testimony of Mr. Whittier as to the 'policy' of the Water Company, which was to sell its water 'to every one that wanted water.' Mr. Whittier at the time he gave this testimony was eighty-four years of age. But Mr. Whittier further testifies that he is giving his evidence from his recollection, and that he is quite sure the records are better evidence, and this, of course, may not be questioned. The final fact before the commission is that the applicant established and maintained a public

watering-trough on the town site of the present city of Hemet before it issued any of its water certificates.

"It is well now, for a clear understanding of the question, to epitomize the position of these petitioners. They concede that the applicant is a public service corporation in so far as the city of Hemet is concerned and as to the amount of water which that city does or may require. They will not object to a finding that such present or future needs on behalf of the city constitute a first and preferential right to the use of the water. They insist, however, that subject to that public use only, they have a private right in ownership by virtue of their water right certificates to the use of all water provided for in those certificates, that their rights being private rights are governed wholly and exclusively by their contracts. Next, as to the excess waters, the rates for which have been fixed by the applicant itself, their attitude is one substantially of indifference as to whether or not the rates to be charged for those waters shall or shall not be fixed by the commission.

"The position of the commission and of the applicant before it is, first, that under the facts above set forth, applicant was from the time of its creation and continuously thereafter a public service corporation, and that it had dedicated all of its waters to public use; second, that whether or not it had so dedicated its waters and properties to public use, by virtue of the laws of this state and their definition of a public utility, the applicant was such a public utility. Necessarily resulting from the upholding of either of these positions it is declared (and granting the premise the conclusion is unescapable) that all of these water right certificates were, in contemplation of law, issued subject to the rate-fixing power of the commission, and that therefore in so fixing the rates in derogation of these contracts no right of contract is violated.

"1. Treating first of the facts above set forth as establishing or failing to establish the public service character of applicant, it may at once be said that when it engaged to supply the town site and the succeeding city of Hemet with water for municipal and domestic purposes and proceeded to do this thing, it became a public service corporation, at least in so far as the needs, present or future, of the growing city of Hemet were concerned. But, of course, it does not follow, either in law or in reason, that because of this, it had dedi-

CLXXIX Cal.—6

cated all its water to public use. To-day the city of Hemet requires but one and a half per cent, or at the utmost three per cent, of those waters. It would be little short of ridiculous to contend that upon the ninety-seven per cent remaining had been imposed the same servitude. Our decisions fully recognize that a private water company may be organized to sell water for purposes of private gain and not in so doing become a public utility. (*Thayer* v. *California Development Co.,* 164 Cal. 117, [128 Pac. 21].) Further, that a company having a single and undivided supply of water (if that circumstance be considered of consequence) may devote its properties and a part of those waters to public service and may retain a part for the advantages of private sale, and not become a public service corporation as to all by virtue of the dedication of a part. (*Leavitt* v. *Lassen Irr. Co.,* 157 Cal. 83, [29 L. R. A. (N. S.) 213, 106 Pac. 404] ; *Thayer* v. *California Development Co., supra; Del Mar Water etc. Co.* v. *Eshleman,* 167 Cal. 666, [140 Pac. 591, 948].) Manifestly the applicant did not become a public utility merely by itself fixing the rates and charges for the water which it sold, nor could its submission to the jurisdiction of the Railroad Commission and its declaration that it was a public utility in the slightest affect the previously vested rights of these petitioners. Herein this case is broadly differentiated from that of *Franscioni* v. *Soledad Land & Water Co.,* 170 Cal. 221, [149 Pac. 161]. In the last-named case, a private corporation had been delivering water for private use under contract. It petitioned the proper authority to fix the rates to be charged for this service. The land owners who had been receiving water under private contract acquiesced in this petition and the rates were fixed. These rates were acted upon by all the parties in interest without question or dissent. Thereafter the company sought to amend its articles of incorporation and declare therein that it was supplying water 'as a private corporation and not as a public water company,' and this court held that it was within the power of a private corporation to change the character of its use, with the assent of the recipients of the water under private contract, that this change had been so effected, and the property having thus become stamped with a public use, it was not within the power of the corporation alone to change that use back to a private use as it undertook to do. So while a public service

corporation cannot out of these waters impressed with a public use sell private or preferential water rights, a private corporation can and may. (*Leavitt* v. *Lassen Irrigation Co., supra; Byington* v. *Sacramento etc. Co.,* 170 Cal. 124, [148 Pac. 791].) Of course the purposes avowed in articles of incorporation do not fix the character of the corporation in its future activities as being a public service corporation. Such declarations of purpose merely serve to give the corporation capacity to engage in such public service if it shall so desire. (*Del Mar Water etc. Co.* v. *Eshleman,* 167 Cal. 666, [140 Pac. 591, 948].)

"So far as weight is to be attached to the purposes of the organization of the applicant as expressed in its articles of incorporation, amongst those purposes is one 'to supply the inhabitants of the towns in San Jacinto Valley with pure water for domestic purposes.' But this standing alone constitutes no dedication of applicant's properties to a public use. A most thorough and elaborate exposition of this, and indeed it may be added, of many other matters pertaining to this consideration, having been made by this court, in *Thayer* v. *California Development Co., supra,* better cannot be done than to quote at some length from that exposition:

" 'The language plainly imports that the right, when acquired, is the property of the person who claims it and takes the steps prescribed to gain it . . . The property does not become impressed with a public use or trust until after the owner has first acquired it and then dedicated it to the use. The acts of acquisition and of dedication, respectively, are distinct from each other. Technically the latter must follow the former and cannot precede or accompany it. An "appropriation of water" under the code is therefore not *ipso facto,* a dedication or appropriation to public use. The additional act of dedication is as necessary to the creation of a public use in a water right so acquired as it would be if the right was acquired by conveyance or in any other manner, or as in the case of any other property dedicated to public use. . . .

" 'According to the theory of the plaintiff in this case, whenever the owner of a water supply determines to and does sell it for a price agreed on between himself and the purchasers, it immediately becomes subject to public use, and any other person to whom it can be conveniently distributed

in the same manner would have the right to a proportionate share of the water on the same terms as the purchasers; and, if the supply is limited, the first purchasers must divide with all others who may come in and claim a share. Under that theory, where a person having a surplus of water parts with a portion of it by sales to others, he thereby appropriates such portion to purposes of sale and dedicates it to public use. This application of the section would destroy private rights in water and convert every sale thereof into a dedication to public use. We do not believe that the constitution was intended to have such effect, or that it should be so construed. Article XIV taken as a whole, shows plainly that it was intended to regulate the use of water appropriated and dedicated generally for sale and distribution among an indefinite number of users. It could not have been intended to declare that a single sale of a part of his water by one having more than he needs would convert the use into a public use in which others could share. If a single sale could not do this, other sales of like character would not accomplish it. The section must be understood to apply to cases where one has appropriated water generally for sale, rental, or distribution, and not to cases where sales are made to particular persons at a fixed price by ordinary contracts of purchase and sale. To compel such subdivision and distribution of water supplies as this construction would entail would destroy the value of all water rights. In this state the water supply is so small that large areas must go without irrigation entirely. Such water as there is must be applied, as far as it will go, in quantities sufficient to make the lands profitably productive. The principal benefit of irrigation comes from its use in growing vineyards and orchards. These require a large expenditure and a permanent water supply to make them profitable. If those engaged in such enterprises know that they must be ready always to divide their water supply with those in the vicinity who may subsequently choose to engage therein, such enterprises would be discouraged, the development, growth, and progress of the state would be much retarded, and its productive capacity greatly decreased.

" 'This provision of the constitution has been in force thirty-three years. It has never been understood that it had the effect here contended for. There have been many instances in which the owners of large tracts of land have ac-

quired water, conducted the same to the land, and sold and conveyed the land in small tracts to actual settlers with a proportionate share of the water appurtenant to the land, coupled with an agreement to continue the water supply at a fixed annual rate. Such a disposition is essentially a matter of private contract, and it shows no intent to create a public use.'

"The quotations above given relieve from the necessity of any further exposition of the matter. This applicant did carry out this declared purpose by dedicating so much of its water to public use as was or might be necessary to supply the town of Hemet. Further than that it has not gone. Further, the articles of incorporation as to the purposes, declare that the corporation will acquire its water and water right 'by purchase and appropriation,' both methods being wholly within the purview of private ownership of such rights when acquired. It is not without significance that there is omitted therefrom the declaration of the right to acquire by condemnation, which right runs only with a public service, and of similar significance is the fact that when this applicant, in the course of its activities needed to acquire and did acquire certain rights of way, it did not undertake to do so by condemnation, but effectuated its purpose by purchase.

"To hold that property has been dedicated to a public use is 'not a trivial thing' (*San Francisco* v. *Grote,* 120 Cal. 60, [65 Am. St. Rep. 155, 41 L. R. A. 335, 52 Pac. 127]), and such dedication is never presumed 'without evidence of unequivocal intention.' (*Niles* v. *City of Los Angeles,* 125 Cal. 512, [58 Pac. 190].) The character of the contracts evidenced by these water-right certificates, the restriction upon transfer, the fixing of the acreage *quantum,* the enormous sum in the aggregate paid by these petitioners for their water rights, establish beyond the need of further discussion that the parties to those contracts believed that they were dealing in their private capacities and selling and receiving water for private use. But one suggestion here is sufficient. Is it conceivable that these land owners would have given Mr. Whittier and his associates, a bonus of $438,938.60 for the right to use water, which right the law had given them without the expenditure of one dollar of it?

"Upon this branch of the case then the conclusion is inevitable that the applicant was not, as to all of its water and

properties, a public service corporation, and that these petitioners entered into their contracts with applicant, both parties to each contract acting as of right in their private capacities. Nothing in the cases relied on by respondents militates against this conclusion. *Franscioni* v. *Soledad Land & Water Co., supra,* has already been considered. In that case there was an acquiescence upon the part of the holders of private contracts to change in use from private to public. Here the holders of such contracts are protesting and have protested from the moment that it appeared that their contractual rights might be impaired. *Limoneira Co.* v. *Railroad Commission,* 174 Cal. 232, [162 Pac. 1033], was a case where the company was indisputably a public service corporation, but it had entered into two agreements which were asserted to be private and beyond regulation. It has heretofore been said that such private right cannot be carved out of a public use (*Leavitt* v. *Lassen Irr. Co., supra*), and the decision of this court upholding the jurisdiction of the Railroad Commission was based upon this ground, this court recognizing that if a new appropriation had been made by the company, waters from which appropriation were to be devoted to this private use, it might well be held that the contracts were of private character. But, so reads the decision: 'There is nothing to compel the conclusion that there was any new appropriation of water to enable the utility to satisfy the requirements of these contracts.' *Palermo Land & Water Co.* v. *Railroad Commission,* 173 Cal. 380, [160 Pac. 228], is of no value to the present consideration, since the contracts there under review in themselves provided for a rate which should be 'fixed by public authority.' And finally it may be added upon this matter that in *Copeland* v. *Fairview Land & Water Co.,* 165 Cal. 148, [131 Pac. 119], this applicant here contended, and successfully contended, against the position which it now takes, the position there taken being that it was not a public service corporation. We do not cite this as being a determinative adjudication upon the question, but it serves at least to illustrate the changeable views which the applicant has entertained of its own activities, functions, and duties. In all respects vital to this consideration these certificates are of the character of those considered in *Stanislaus Water Co.* v. *Bachman,* 152 Cal. 716, [15 L. R. A. (N. S.) 359, 93 Pac. 858]. In the Thayer case, *supra,* it was decided

that the sale in gross by a water company of water to a mutual water company was not a dedication of such waters to public use.  In *Marin Water & Power Co.* v. *Town of Sausalito,* 168 Cal. 587, [143 Pac. 767], it was decided that a sale and delivery of water by a water company to a municipality owning its own water system, to be sold by the municipality to its inhabitants, was not a dedication of such water so sold in gross to a public use so that the gross rates were subject to municipal regulation.  It is not possible to see how, in the light of the principles upon which these adjudications are rested, it can be held that these private contracts with private individuals for a private supply of water upon their private lands was a dedication of such waters to public use.

"2. The second position adopted by respondents, as above outlined, is that this applicant is a public service corporation, without regard to the question of the dedication of its properties to public use, by virtue of the definitions of such public service corporations found in our law.  To begin with, the constitution, article XII, section 23, declares that every private corporation furnishing water 'either directly or indirectly, to or for the public, . . . is hereby declared to be a public utility,' subject to control and regulation by the Railroad Commission.  Further, this section of the constitution declares that: ' . . . every class of private corporations, individuals, or association of individuals, hereafter declared by the legislature to be public utilities shall likewise be subject to such control and regulation.'  And finally this section provides that the right of the legislature to confer powers upon the Railroad Commission respecting public utilities is plenary and unlimited by any provisions of the constitution.  Pursuant to this constitutional definition and grant of power, the legislature in 1913 (Stats. 1913, p. 84, c. 80) declared, 'Whenever any . . . corporation . . . sells, leases, rents or delivers water to any person, firm, private corporation, municipality or any other political subdivision of the state whatsoever, except as limited by section 2 hereof, whether under contract or otherwise, such person, firm or private corporation is a public utility, and subject to the provisions of the public utilities act of this state and the jurisdiction, control and regulation of the railroad commission of the state of California.'  And the Public Utilities Act (Stats. 1915, p. 118) defines a water corporation in the following language: 'The term "water

corporation,'' when used in this act, includes every corpora-
tion or person, their lessees, trustees, receivers or trustees ap-
pointed by any court whatsoever, owning, controlling, operat-
ing or managing any water system for compensation within
this state.' It must in this be recognized that the constitu-
tion of this state and the legislature in pursuance of it has
undertaken to put out of existence any and all private rights
in the matter of the rental or sale of water. So far as our
constitution and laws are concerned the state has done this
thing. There stands between it and its enforcement, so far
as this court is concerned, only the constitution of the United
States, which, as the supreme law of the land is, whenever it
speaks, the supreme law of this state.

"What is a public utility, over which the state may exer-
cise its regulatory control without regard to the private in-
terests which may be affected thereby? In its broadest sense
everything upon which man bestows labor for purposes other
than those for the benefit of his immediate family, is im-
pressed with a public use. No occupation escapes it, no mer-
chant can avoid it, no professional man can deny it. As an
illustrative type one may instance the butcher. He deals with
the public, he invites and is urgent that the public should
deal with him. The character of his business is such that
under the police power of the state it may well be subject to
regulation, and in many places and instances is so regulated.
The preservation of cleanliness, the inspection of meats to see
that they are wholesome, all such matters are within the due
and reasonable regulatory powers of the state or nation. But
these regulatory powers are not called into exercise because
the butcher has devoted his property to public service so as
to make it a public utility. He still has the unquestioned
right to fix his prices; he still has the unquestioned right to
say that he will or will not contract with any member of the
public. What differentiates all such activities from a true
public utility is this, and this only: That the devotion to pub-
lic use must be of such character that the public generally,
or that part of it which has been served and which has ac-
cepted the service, has the right to demand that that service
shall be conducted, so long as it is continued, with reasonable
efficiency under reasonable charges. Public use, then, means
the use by the public and by every individual member of it,
*as a legal right.* Such is not only the accepted significance

of the phrase by the great weight of authority as expounded by Mr. Lewis (Eminent Domain, sec. 164 et seq.), but is the definition repeatedly announced by this court. Thus, in *Pinney & Boyle Co.* v. *Los Angeles Gas & Electric Co.*, 168 Cal. 12, [Ann. Cas. 1915D, 471, L. R. A. 1915C, 282, 141 Pac. 620], explaining that it is not the use which the consumer makes of the commodity which constitutes the test as to whether or not the owner or purveyor of that commodity is a public service corporation, it is declared: 'It is the duty which the purveyor or producer has undertaken to perform on behalf of and so owes to the public generally, or to any defined portion of it, as the purveyor of a commodity, or as an agency in the performance of a service, which stamps the purveyor or the agency as being a public service utility.' To the same effect is *Thayer* v. *California Development Co., supra,* while in *Del Mar Water etc. Co.* v. *Eshleman,* 167 Cal. 666, 680, [140 Pac. 591], it is declared that 'even a constitutional declaration cannot transform a private enterprise or a part thereof into a public utility and thus take property for public use without condemnation and payment.'

"Our constitution and our statutory definitions above quoted therefore must be construed as applying only to such properties as have in fact been devoted to a public use, and not as an effort to impress with a public use properties which have not been devoted thereto. For if the latter be the true construction of our constitution and statutes, then manifestly in their operation they are void wherever they unjustly interfere with private property or private contractual rights by force of article I, section 10, and of the fourteenth amendment of the constitution of the United States. If the first alternative be selected then, for reasons already given, such parts of these properties as are affected by the contracts with these petitioners have not been devoted to public use and their private contractual rights must prevail.

"For these reasons the determination, conclusion, and judgment of the commission that these petitioners' contractual and vested rights are subordinate to the regulatory powers of the commission is in excess of the commission's jurisdiction and therefore void, and in so far the decree of the commission is annulled."

Lorigan, J., Melvin, J., and Richards, J., *pro tem.,* concurred.

WILBUR, J., Dissenting.—I dissent. The main opinion
holds that our state constitution, and laws passed in pursu-
ance thereof, authorizing the Railroad Commission to fix rates
for the use of water, are in conflict with the federal constitu-
tion prohibiting the impairment of contracts, and are to that
extent void and of no effect. It concedes that the state has
exerted to the full all its sovereign powers to regulate and
control the rates for the use of water, but holds the state to be
impotent in the presence of the private rights to water and
its distribution in this case. I concur in the main opinion in
so far as it holds that the right to water (one-eighth inch
per acre) is a private right. It was so held in *Thayer* v.
*California Development Co.*, 164 Cal. 117, [128 Pac. 21],
and the subsequent constitutional amendment and statute
must be held to have been adopted in view of that decision.
But the decision of the Railroad Commission does not inter-
fere with that right. To an understanding of the case it is
essential that some facts disclosed by the record be stated in
addition to those set forth in the main opinion. The con-
tracts under which the petitioners claim, in addition to secur-
ing to them a certain amount of water, require the Water
Company to deliver such water "at such points on the pipes
or conduits of the party of the first part (Water Company)
as may be nearest the land" of the grantee. The contract
thus recognizes that the distributing system belongs to the
Water Company. For this system the Water Company has
expended four hundred and forty-seven thousand dollars,
paid in by its stockholders. It has also received $438,938.60
from the sale of its water, a part, or all of which, was ex-
pended in payment of current expenses. It would cost
$657,385 to reproduce the distributing system. That the
Water Company has done all in its power to dedicate its
water and its distributing system to a public use is held in the
main opinion, and that having conceded and invoked the ju-
risdiction of the Railroad Commission the Water Company
should be bound by its dedication is held in *Palermo Land &
Water Co.* v. *Railroad Commission*, 173 Cal. 380, 384, [160
Pac. 228], where it is said by the court in Bank: " . . . it
appears that in December, 1912, the Palermo Company ap-
plied to the Railroad Commission to have its rates for water
established and that the commission made its order allowing
an increase in the rates theretofore in effect. (Opinions and

Orders of the Railroad Commission, vol. 3, p. 1247.) The case, therefore, falls directly within the doctrine of *Franscioni* v. *Soledad Land & Water Co.*, 170 Cal. 221, [149 Pac. 161], where we held that as against the Water Company such submission to the authority of the regulating body was effective to 'change the use from a private and particular use to a public use so as to make the service and terms of delivery subject to regulation and control by public authority.' No valid distinction can be drawn between the Franscioni case and the one before us." (*Palermo Land & Water Co.* v. *Railroad Commission, supra.*) In the instant case the owners of property, costing $657,385 to reproduce dedicates the same to a public use, and the state, through its constitution, its laws and its duly accredited representatives, accepts and acts upon such dedication. It is held in the main opinion that such dedication of such property is ineffectual. If it is once conceded that the distributing system is, or has been, dedicated to a public use, it follows that the rates to be charged for the use thereof, are to be fixed by public authority, and that the inhibition of the federal constitution against the impairment of contracts does not apply, even though rates in excess of the contract rates are fixed. (*Limoneira Co.* v. *Railroad Commission*, 174 Cal. 232, [162 Pac. 1033].) The main opinion holds that the purchasers of the water contracts not only secured a right to the water, but also secured an easement in the distributing system attaching to the land, and thus have a property right in the pipe-lines, citing *Stanislaus W. Co.* v. *Bachman*, 152 Cal. 726, [15 L. R. A. (N. S.) 359, 93 Pac. 858]; *Copeland* v. *Fairview Co.*, 165 Cal. 154, [131 Pac. 119]; *Palermo Land & Water Co.* v. *Railroad Commission*, 173 Cal. 386, [160 Pac. 228]. If we hold that the owners of water certificates have a property right so definite in the pipe-lines and distributing system as to prevent the dedication thereof to a public use by the Water Company, it would seem that such owners should at least bear the corresponding burden of the maintenance thereof, including their proportion of the expense of distribution of the water contained therein, particularly as against the public also served thereby. The Railroad Commission finds that the system has at all times been run at a loss. Neither the public nor the private users of water have paid their proportion of the expense of maintenance. The annual loss, including de-

preciation, now approximates thirty thousand dollars. The proportion thereof properly apportioned to the owners of water certificates (94 per cent according to the main opinion), would be twenty-eight thousand two hundred dollars. If the system is to remain a going concern this amount, at least, must be assessed upon the public users (the three to six per cent), if the private users cannot be required to pay more than the contract rate. The holders of water certificates bought with knowledge that the system was used and to be used to distribute water devoted to a public use. By thus consenting that public waters, mingled with their private waters, could be conveyed through the distributing system in which they have an interest, they assented to the use of their property (the pipe-line) for a public use. If they owned the whole pipe-line and thus used it, it must be conceded that they thereby dedicated the same to a public use. Why does not their assent to such use of their undivided right therein necessarily constitute such a dedication thereof to a public use? Their rights in the water and in the system can be recognized by the Railroad Commission in fixing rates. A rate proportionately lower than that imposed on those having no property right in the water or distributing system can be fixed. Although it is conceded that the statute authorizes the fixing of rates by the Railroad Commission in this case, if constitutional, it is well to observe that the commingling of public and private waters in a privately owned distributing system is expressly made a basis of the jurisdiction of the Railroad Commission. (Stats. 1913, p. 85, secs. 2, 3, 4.)

"Sec. 2. Whenever any private corporation or association is organized for the purpose solely of delivering water to its stockholders or members at cost, and delivers water to no one except its stockholders or members at cost, such private corporation or association is not a public utility, and is not subject to the jurisdiction, control or regulation of the railroad commission of the state of California.

"Sec. 3. Whenever any private corporation or association organized for the purpose of delivering water solely to its stockholders or members at cost does deliver water to others than its stockholders or members for compensation, such private corporation or association becomes a public utility and subject to the terms of the public utilities act and the

jurisdiction, control and regulation of the railroad commission of the state of California.

"Sec. 4.   Whenever any private corporation or association is organized both for the purpose of delivering water to its stockholders or members at cost and to persons, firms, corporations, municipalities or other political subdivisions of the state in addition thereto, such private corporation or association is a public utility and subject to the provisions of the public utilities act and to the jurisdiction, control and regulation of the railroad commission of the state of California."   (Stats. 1913, p. 85.)

It is, of course, the duty of the Railroad Commission to recognize private and constitutional rights and fix the rates with reference thereto.   In this case, while finding, erroneously, as we hold, that all the water distributed by the Water Company was dedicated to a public use, it nevertheless refused to consider the value of the water as a basis for fixing the rates, and, although the Water Company at first sought a reasonable interest upon the alleged value thereof (four hundred and ninety-four thousand dollars) the company abandoned its claim, and the Railroad Commission refused to recognize it.   In short, in effect, the water-users who had paid four hundred and thirty-eight thousand dollars therefor, were recognized as entitled to water claimed to be worth four hundred and ninety-four thousand dollars.   The Railroad Commission fixed rates for water that would pay the operating and maintenance expenses and give a revenue to the company on a capitalization of less than one-half of the value of their distributing plant.   It seems clear that the Water Company and the certificate-holders, by express dedication and by necessary implication, have consented to the jurisdiction of the Railroad Commission in so far as the distributing system is concerned, and that, therefore, it has jurisdiction, and that in the exercise of that jurisdiction it has not violated any rights of petitioners in the water or distributing system, such as would justify our interference.   I, therefore, conclude that the jurisdiction of the Railroad Commission may be well predicated upon the consent of the Water Company and the implied consent of the certificate-holders whose property rights are given due consideration by the Railroad Commission.   It is also true, I think, that the business of storing, conserving, and distributing water, whether privately owned

or dedicated to public use, to large tracts of land for the use of large numbers of persons for domestic and irrigation purposes in an arid state, particularly where such distributer enjoys a monopoly, is so clearly a matter of great public concern as to justify the people in declaring that such business is a public utility. It is unnecessary to give reasons in detail for such an obvious conclusion, but it may be noted that changed labor conditions, increased cost of supplies and materials necessary to maintain such distributing system, bankruptcy, termination of corporate existence, or death of individuals furnishing water, all have a marked effect upon the ability of the distributer to distribute water, and upon the public so furnished with water, and that the ordinary remedies for breach of contract to distribute or deliver water, or equitable actions to protect and enforce such contract rights would be wholly inadequate to protect the public directly and indirectly affected by such failure and the consequent damage. Many of these considerations, however, do not apply to the corporations excepted from control of the Railroad Commission, for the reason that in such mutual companies the actual cost of maintenance, whether great or small, is distributed among the water owners. As we are dealing with legislation that definitely and clearly authorizes the fixing of the rates for the Water Company under constitutional provisions, authorizing such legislation and providing for such fixing of rates (art. XII, sec. 23, art. XIV), we need only consider whether the federal constitution prohibits such action, and for that purpose we must look to the supreme court of the United States as final and conclusive authority. The question of the limitations upon the state legislative power by the federal constitution has been frequently under consideration by that court. Only a few cases need be noted.

In *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347, [28 L. Ed. 173, 4 Sup. Ct. Rep. 48], the supreme court of the United States said: "That it is within the power of the government to regulate the prices at which water shall be sold by one who enjoys a virtual monopoly of the sale, we do not doubt. That question is settled by what was decided on full consideration in *Munn* v. *Illinois*, 94 U. S. 113, [24 L. Ed. 77]. As was said in that case, such regulations do not deprive a person of his property without due process of law."

In the case of *Munn* v. *Illinois, supra,* in passing upon the power of the legislature of the state of Illinois to declare grain elevators public utilities and regulating rates for the storage and handling of grain, the supreme court said: "This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what without its operative effect. Looking, then, to the common law, from whence came the right which the constitution protects, we find that when private property is 'affected with a public interest, it ceases to be *juris privati* only.' This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise, De Portibus Maris, 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but so long as he maintains the use, he must submit to the control."

In *Atlantic Coast Line R. R. Co.* v. *City of Goldsboro,* 232 U. S. 548, [58 L. Ed. 721, 34 Sup. Ct. Rep. 364], the rule is thus stated: "It is settled that neither the 'contract' clause nor the 'due process' clause has the effect of overriding the power of the state to establish regulations that are reasonably necessary to secure the health, safety, good order, comfort or general welfare of the community; that this power can neither be abdicated nor bargained away and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise. (*Slaughter-house Cases,* 6 Wall. 36, 62, [21 L. Ed. 394]; *Munn* v. *Illinois,* 94 U. S. 113, 125, [24 L. Ed. 77]; *Beer Co.* v. *Massachusetts,* 97 U. S. 25, 33, [24 L. Ed. 989]; *Mugler* v. *Kansas,* 123 U. S. 665, [31 L. Ed. 205, 8 Sup. Ct. Rep. 273]; *Crowley* v. *Christensen,* 137 U. S. 86, 89, [34 L. Ed. 620, 11 Sup. Ct. Rep. 13]; *New York etc. Co.* v. *Bristol,* 151 U. S. 556, 567, [38 L. Ed. 269, 14 Sup. Ct. Rep. 437]; *Texas etc. Co.* v. *Miller,* 221 U. S. 408, 414, 415, [55 L. Ed. 789, 31 Sup. Ct. Rep. 534].)"

In determining the question whether or not a business is of such public interest and concern as to subject it to regulation as a public utility, the supreme court of the United States holds that that question is primarily one for the legislature. In *Munn* v. *Illinois, supra,* it is said: "For our purpose we must assume that, if a state of facts could exist that would justify such legislation, it actually did exist when the statute now under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the state. But if it could, we must presume it did. Of the propriety of legislative interference within the scope of legislative power, the legislature is the exclusive judge."

It seems clear from these authorities, upon the facts found by the Railroad Commission, that the state had power to declare the water system a public utility. It finds that "The consumers concede that in so far as the supply of domestic water to persons other than the holders of water certificates is concerned, petitioner is a public utility." That the "petitioner adopted rules and regulations for the sale of water for irrigation and domestic use, which rules were printed and distributed to its consumers and referred to in petitioner's advertisements. Petitioner's business has grown from its initial supply of domestic water to the first inhabitants of what is now the town of Hemet, until in 1915, as shown by petitioner's annual report for the year ending December 31, 1915, on file with the Railroad Commission, petitioner sold water through 85 meters for irrigation, 481 meters for domestic use, 5 meters for manufacturing and power, and 6 meters for public use. During the same year petitioner sold water measured through other devices for the irrigation of 5,554 acres of land. Approximately two thousand five hundred people, including approximately one thousand five hundred in the town of Hemet, rely upon petitioner's system as their sole source of water." That the "petitioner is a water company, incorporated under the laws of this state. It is the only water system in control of water which it sells for compensation. For more than twenty-five years petitioner has been engaged in the sale of water to the entire public on the land to the service of which petitioner has dedicated its water. Petitioner has fixed and enforced rates, rules and regulations

for the service of water for irrigation and domestic purposes and to the town of Hemet for public purposes. Petitioner's water system consists of watershed lands, the Lake Hemet Reservoir on the south fork of the San Jacinto River, diversion works at four points of diversion, transmission mains of riveted steel and wood pipe, wooden flume and lined ditch and a distributing system of wooden and concrete flume, concrete and riveted steel pipe, all used in the delivery of water to wholesale and irrigation consumers. In addition, petitioner owns and operates a separate system with a separate diversion for the distribution of water through riveted steel and standard screw pipe to domestic consumers. In the operation of its system petitioner for more than fifteen years has had the control and use of seventeen-twentieths of the water of the north fork of the San Jacinto River and Strawberry Creek under agreements with Fairview Land and Water Company, the owner of such waters. The safe yield of petitioner's water system is one hundred and sixty-one thousand miner's inch days annually, or 6,376 acres feet delivering 725 miner's inches during the irrigating season."

It is also found that the Water Company had issued:

(a) Contracts covering 69.36 acres at the rate of five dollars per acre, per year.

(b) Contracts covering 5,874.77 acres at the rate of two dollars per acre per year, and that the amount of acres irrigated was 5,554. That "Petitioner's total operating expenses to December 31, 1914, was $512,353.87; $93,607.43 was depreciation. Total cost of operation was $418,746.44. Total revenue, after deducting receipts from the sale of water rights, $239,824.47. It thus appears that the result of petitioner's operations under its rates now in effect has been a gross revenue of $178,921.97, less than bare operating and maintenance expenses."

We are not called to pass upon the reasonableness of the rates fixed by the Railroad Commission, if no constitutional right is invaded.

I therefore conclude that the Railroad Commission had authority to fix rates under the constitution and law:

First, for the reason that the Water Company had consented thereto by the express dedication of all its interest in the system, and that the Railroad Commission was empowered and required in fixing rates to fix them with due regard to the

CLXXIX Cal.—7

private ownership of the water certificate holders in the water and the distributing system.

Second, for the reason that the owners of water certificates had consented to the use of the distributing system, and their interest therein by the public, and had thus jointly with the Water Company dedicated the distributing system to a public use.

Third, for the reason that the character of the business conducted by the Water Company and water users authorized the state to declare the same a public utility, and to provide for the fixing of rates by the Railroad Commission, whose duty it was to fix rates in due recognition of the private rights of water certificate holders in such property, and that the intervention of this court is only proper where a clear violation of such rights appears.

Rehearing denied.