[L. A. No. 7587. In Bank.—December 24, 1923.]

## C. J. KLATT, Petitioner, v. THE RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[1] PUBLIC UTILITIES—UNDERSTANDING BETWEEN OWNER OF WATER PLANT AND NEIGHBORING LAND OWNERS—USE OF SURPLUS WATERS —PAYMENT—EFFECT OF.—Where the understanding between the owner of a water plant and neighboring land owners was that the latter could have the water when the owner did not need it for his own purposes and take it in the order of their application, the fact that there was a monetary consideration for the service, especially when considered with the circumstance that the receipts only paid for the electricity to operate the plant, does not prove that the water was not surplus or that the plant was a public utility.

[2] ID. — DEDICATION — INTENTION — EVIDENCE.— There must be clear proof of an unequivocal intention to dedicate property to a public use before it can be taken from the owner.

[3] ID.—DEDICATION—EVIDENCE—CERTIORARI.—In the examination of the evidence by a reviewing court on the question of dedication the rule must be kept in mind that the probative effect of the evidence is left to the determination of the Railroad Commission and that the survey of the reviewing court is limited to the legal question whether, conceding the facts relied upon by the commission to be true, a case of dedication is made out.

[4] ID.—WATER PLANT OF INDIVIDUAL—STATUS OF—DEDICATION—EVIDENCE.—Where an owner of a water plant allowed neighboring land owners to lay pipes and use water when it was surplus, each consumer being required to apply for the water and allowed to take it in his turn without serious inconvenience by occasional delays in securing permission to use the water, and such service was uniformly furnished under these conditions for about ten years, during which period there never was a lack of surplus water, and the money collected for the service was merely sufficient to pay for the electricity used, and no consumer ever questioned the arrangement or claimed that the owner had dedicated the water to the public, under such circumstances to declare that the water had been dedicated to a public use would be to take the property of said owner in the absence of intent, declaration, or act on his part to relinquish his right thereto.

4. Irrigation companies as public utilities, notes, 8 A. L. R. 268; 15 A. L. R. 1227.

PROCEEDING in Certiorari to annul an order of the Railroad Commission declaring water plant of individual a public utility.   Order annulled.

The facts are stated in the opinion of the court.

Scarborough, Forgy & Reinhaus for Petitioner.

Hugh Gordon and Carl I. Wheat for Respondent.

LAWLOR, J.—On January 23, 1923, petitioner, C. J. Klatt, brought this proceeding to review the action of the Railroad Commission in declaring the water system and a pumping plant on his land to be a public utility and subject to its jurisdiction. The complainants were Theodore W. Bose, Flake L. Smith, Robert Gerwing, and John Sebastian, and their application to have the water system declared a public utility was filed on December 31, 1921. At the hearing on January 26, 1922, petitioner made an oral objection that the Commission had no jurisdiction of either the person of petitioner or of the subject matter, and this objection was based on the claim that no copy of the application or summons was ever served upon him in conformity with section 60 of the Public Utilities Act (Stats. 1911 (Extra Sess.), p. 52). On March 27, 1922, the Commission filed an opinion and made an order declaring the water system and pumping plant to be a public utility and directing petitioner to resume the service of water for irrigation use to such persons as were formerly served by the pumping plant and that he file a schedule of rates.   On April 17, 1922, petitioner applied for a rehearing upon the grounds that the Commission never acquired jurisdiction over his person; that the finding that the water system operated as a public utility subject to the jurisdiction of the Commission is contrary to the evidence; that the uncontradicted evidence conclusively shows "that C. J. Klatt is not a public utility"; that the water system or plant operated by petitioner is not and never had been dedicated to a public use, and that the Commission had no jurisdiction to decree that the pumping plant had ever been dedicated to a public use. An order for rehearing was made on October 5, 1922. On the hearing that followed it was stipulated

that the evidence on the first hearing be considered as apply-
ing to the second. The only additional evidence on the
second hearing related to the service furnished to two con-
sumers under an oral agreement between petitioner and the
two consumers, who are not complainants herein; such
agreement having for its object the building of a new plant,
hereinafter referred to as the "new well"—the two con-
sumers to become part owners thereof. In other respects
the second opinion and order filed on December 29, 1922,
were identical with the first.

It appears the petitioner is the owner of 22.55 acres of
land near the city of Santa Ana, Orange County, California,
which are devoted to the culture of walnuts, apricots, and
citrus fruits. The original owner of the property, one H. S.
Pankey, first improved the land and developed water
thereon, although at the time he purchased it a closed well
was on the place. In order to irrigate the property he
began a series of experiments with pumps. After develop-
ing the water in what is known as the "old well," which
was located on the northeast portion of the land, H. S.
Pankey laid a main pipe-line diagonally to the east; later
one to the west. The old well was ten inches in diameter,
sixty feet in depth, and furnished from thirty-five to forty
inches of water per hour. There were periods when H. S.
Pankey was not pumping water for his own use so he
granted permission to several of his neighbors, who were
setting out fruit trees, to lay pipe-lines to connect with his
main pipe-line. He testified that the understanding was
that they could have the water when he did not need it for
his own purposes—in other words, they could have the sur-
plus water. During the eight or ten years H. S. Pankey
furnished his neighbors water from his plant for irrigation
purposes, he only allowed them to pump it when he had no
use for it himself; and in order to get the water, the con-
sumer had to apply for it in each instance; each consumer
to wait his turn. Under this arrangement a charge of fifty
cents per hour on an estimated basis of consumption was
made for the service and it is stated this was later raised
to sixty or sixty-five cents. The price for water was fixed
without regard to the depreciation of the plant, interest,
cost of operation, and the like. However, H. S. Pankey
stated that the amount he collected for water just about

paid the electric power bill. It appeared he kept no record of the money collected from the consumers. In January, 1919, he deeded the property to his son, J. H. Pankey, and to his two daughters, Pearl Pankey and Dora Glines. During the year these grantees owned the property water was furnished through the pipe-lines to the consumers upon the same conditions and at the same rate.

In January, 1920, these grantees sold the property to petitioner. Before he became the owner he knew of the service of water by his predecessors to the neighbors by means of the system of pipe-lines, and was informed that a charge was made for such service. He was also informed that this helped pay the electric power bill. Petitioner furnished water from the old well to the complainants and others, at an increased rate of eighty-five cents per hour. He continued the service for approximately eighteen months, that is, until the latter part of August, 1921. During that summer the old well was only pumping ten or fifteen inches of water per hour so petitioner started to drill the new well. The new well is twenty-four and one-half feet distant from the old well and attained a depth of 386 feet. It is twelve inches in diameter and furnishes seventy inches of water per hour. There is no connection in the source of supply of the water in the old and new well. None of the machinery or material, except a few boards from the old pumphouse, was used in the new plant. For the purpose of testing the capacity of the new well the pump from the old well was temporarily installed therein and thereafter sold before the new well went into operation. Petitioner purchased new equipment and machinery for the new plant. After this well was drilled, but before the new pump was installed, petitioner proposed to the former consumers that they buy into the plant. The proposition was oral and was to the effect that those who wanted water must buy an interest on an acreage basis "in the pumping plant as it now exists" at actual cost, and pay a proportionate share of the expense of operation. Petitioner stated that the approximate cost of the installation of the plant "as it now stands" was about $4,200 or $4,300.

No water has been supplied from the new well to the complainants or to others with the exception of the two neighbors already referred to, who agreed to purchase an interest

in the new plant. While no water was supplied from the new well, a stipulation was entered into between petitioner and complainants at the first hearing before the Commission to the effect that petitioner will furnish water to them at $1.50 per hour, pending the determination of the matter by the Commission, "without waiving any rights he may have in the matter and without conceding the jurisdiction and without prejudicing his rights in any way whatsoever." It appeared on the second hearing that the service was rendered under the stipulation.

The claims of each of the parties are twofold—petitioner contending that the old well was not a public utility and would not have come under the jurisdiction of the Commission, and that the new well is not a public utility and subject to the jurisdiction of the Commission—and respondent insisting that the service from the old well is impressed with a public use and, therefore, subject to regulation by the Commission, and that the sinking of a new well did not relieve petitioner from the duty of continuing the service.

The opinion of the Commission states that the original owner furnished water to other ranchers for compensation; that no applicants were ever refused service; that in one instance at least H. S. Pankey advised the owner of adjoining land to set out an orchard and assured him he could depend upon the "Pankey plant" for the water required for irrigation; that all water desired by consumers was supplied to them; that the relation of buyer and seller of water was entered into with an apparent understanding that such relations would continue; that the water was supplied upon application by consumers in the order in which the applications were received, and this method does not thereby differ from the usual practice followed in systems of this type; that it was not shown that any consumer was deprived of water or was subjected to undue delay because of the claim that only surplus water was sold or that the use of water by purchasers was through a right which was inferior or secondary to the right of the owner of the plant; that the claim that no profit was made through sales of water is not a material matter, and that the obligation to render service cannot be avoided through changes in location or equipment of the plant at the option of the owner, because, once assumed, the obligation to serve the

public continues. The opinion further states that the only written agreement of record in the matter is a contract, hereinafter detailed, between J. H. Pankey and Myra E. Holderman; that nothing contained therein can be construed to mean that water was furnished as an accommodation, or as a neighborly act, or that the right granted was for surplus water and was inferior or secondary to the right of the owner of the plant, that the possibility that another well might be required was distinctly recognized and it was provided that should the second well be developed the supply of water would be continued; that if the intention was to sell only surplus water or to sell water only as an accommodation or as a neighborly act, that such intention would have been clearly stated. It concludes by stating that: "A careful consideration of the evidence leads to the conclusion that the proprietor of the original plant willingly assumed the obligation of serving the public; that this obligation was transferred to the respondent [petitioner herein] when the property was purchased by him; and that service to applicants should be resumed."

The testimony is practically uniform in this case that the understanding throughout was that the consumers could have only the surplus water and take it in the order of their application when the owner was not using it. The witness John Sebastian, however, testified that in the spring of 1918, before he put out his trees and when he asked H. S. Pankey if he could get water, the latter answered: "You can get the water when you want it—that is about the substance of the conversation between Mr. Pankey and I." Sebastian testified later that the trees were planted in the spring of 1919, when the grantees of H. S. Pankey owned the property and furnished him with water. In January, 1920, after petitioner acquired the property the subject of the water was discussed between them. Petitioner was irrigating his own trees at the time and he told Sebastian that he could have the water after he got through. John Sebastian testified: "That was the agreement all along, that each one go in rotation." He further said the agreement with petitioner was not made at any set time—"it had been handed down," and that "the system of rotation was a kind of understanding." It is clear from the entire testimony of this witness that when he quoted H. S. Pankey, to the effect that he

could have the water when he wanted it, was meant surplus water and that he could have it on the same terms and conditions as the other consumers, namely, when the owner was not using it, and this tallies with H. S. Pankey's testimony that he told Sebastian he could have the water when it was surplus. H. S. Pankey's version is clearly shown by the record: "Q. You didn't consider the interest on your investment at all? A. Never thought anything about that. Q. Did your own time in caring for the plant—you cared for it yourself didn't you? A. Yes. I turned the water on and let it go. Q. Didn't consider your own time at all? A. Didn't consider my own time because there wasn't much time; only turned the water on when they asked for it. Q. Did you consider depreciation of the machinery or anything of that nature? A. No. Q. And it was always understood that all they were to get was your surplus water? A. Yes, sir. Q. If there was no surplus they would not get any? A. Well, I always told them like this: as long as I have any water to spare you can have it. Q. That was the understanding? A. But there might be another question coming in there; I always told them I expected to have water always. Q. You expected to have water? A. Yes, sir. Q. Now, Mr. Pankey, did you expect to dedicate this water to public use, to the public, generally? A. No, sir. Q. Did you intend to serve any portion of the public generally? A. Only in the way I have stated. They could have the water any time I didn't need it." This is supported by the testimony of Sebastian that he had to wait for the water if it was being used by petitioner for irrigation purposes. With the possible exception of Theodore W. Bose, whose testimony showing his attitude at the hearing we will presently consider, the testimony of the remaining consumers is that they were to have the water when it was surplus and in the order of their application when the owner was not using it. Theodore W. Bose testified he thought he had been furnished the service "through the way of being a public utility" because "there has been water furnished for a good many years to this property that I own." He testified that he produced a contract in response to a remark of petitioner that he (Bose) did not have a "scratch of paper of any kind to show that he must give this water." This discussion arose at the time the proposition to have

the consumers purchase shares in the new well was under
consideration. The contract, dated October 18, 1917, was
executed by J. H. Pankey, party of the first part, and Myra
E. Holderman, party of the second part. J. H. Pankey
was not the owner of the water supply at the time, but
H. S. Pankey who was the owner, also signed the agree-
ment. Subsequently, the party of the second part trans-
ferred the seven acres and assigned the contract to Burr
Talbert, the immediate grantor of Theodore W. Bose, using
the name "Myra E. Coate, formerly Myra E. Holderman."
The agreement was to the effect that the party of the first
part grants the right to purchase water for the seven acres
of land belonging to the party of the second part from the
pumping plant which is now and has been supplying water
to the same seven acres; that the second party pay for the
use of water the same rate per hour that is paid by the
other parties in the same locality purchasing water from
the said plant; *that said water be distributed among the
various users in the same manner that it has heretofore been
used;* and that should the water in said well become insuffi-
cient to justify pumping, the first party shall not be re-
quired to furnish water for the seven acres until such time
as the water in said well shall increase to a point where a
reasonable amount can be pumped therefrom or said first
party shall have developed another well on the same prem-
ises. The testimony that petitioner did not know of the
existence of this contract until it was shown to him by
Theodore W. Bose, in August, 1921, after the service had been
discontinued, is not contradicted. The contract does not by
its terms negative the proposition that the water was to be
surplus, but, on the contrary, the clause we have italicized
above indicates a continuance of the arrangement for sur-
plus water and the manner of distribution which had been
in force since approximately 1909 or 1910. It seems clear
that under the contract the party of the second part was to
receive surplus water only and that her rights and those of
her assigns were the same as the other consumers as to sur-
plus water and the distribution thereof. It follows that
the rights of all the consumers in these particulars were the
same—secondary to those of the owner. This conclusion is
strengthened by the fact that the contract did not obligate
the owner to sink a new well when the supply of the first

was insufficient to justify pumping. It simply provided that in the event a new well were established the party of the second part would be entitled to the water on the former basis. The contract does purport to bind J. H. Pankey, and possibly H. S. Pankey, to furnish water to the party of the second part or her assigns, provided the supply from the old well is sufficient or a new well takes its place. However, Theodore W. Bose testified that he is not relying on the contract but on the claim that the water supply from the new well is a public utility. It does not appear that he ever claimed the plant was a public utility before he testified at the hearing, and he did not claim when the proposal for joint ownership of the new well was broached or at any other time before the hearing that it was a public utility and he said he never talked with anyone about it. He simply ''thought'' it was a public utility. This is hardly the equivalent of a statement that the plant had been dedicated to a public use. The only claim he made in the conversation with petitioner when the contract was mentioned was ''that he [petitioner] didn't have no right to make those changes,'' referring to the discontinuance of the service.

It appears from the record that prior to this proceeding none of the consumers ever claimed that the water was furnished from a public utility. Nor was it ever claimed they had a right to demand the service or that the conduct of the owners indicated an intention to dedicate the plant to a public use. The time to have voiced the demand was when petitioner declined to furnish the water to the consumers from the new well, and made the proposal that they all buy shares on an acreage basis. All of them, with the exception of Theodore W. Bose, whose attitude we have already discussed, expressed themselves in favor of the proposition. Later, when it became apparent that they must either accept petitioner's proposal or get no water, they attempted to persuade him to furnish the water as formerly, even offering an increased rate. In a letter to petitioner, dated November 1, 1921, Theodore W. Bose stated: ''I must say in regard of this water proposition, I haven't got the money to put in. I would like to, and would surely do it, if I could. I would have told you the other day, when I talked to you, but I didn't have no chance. I have been to a lot of expense moving out here. I want to sell my

eastern property, but couldn't under the conditions things are in, and that put me so short of money. Isn't it possible, Mr. Klatt, that you could let me have the water? I would be willing to pay you $1.25 per hour. I hate to do this, but this is exactly the condition I am in." Flake L. Smith said he would make arrangements to get the money for his share, and John Sebastian suggested that they try to induce a neighbor of his who owned twenty acres of land to join with them so as to reduce the proportionate cost and expense. John Sebastian testified that he "endeavored to, in a friendly way, show him [petitioner] why he shouldn't cut me or any of us from water; tried to figure and reason with him; that it was all out of the question and really it would be to his advantage to let us have water; I argued along that line, but he continually refused to let me have water. . . . " As already stated, there is no suggestion anywhere in the record that the consumers prior to the hearing ever claimed the plant to be a public utility, entitling them to demand water as a matter of right.

We quote from the order of the Commission: "It is hereby found as a fact, that the water system operated by C. J. Klatt, . . . is a public utility, and that the said C. J. Klatt has been rendering public utility service therefrom, and that such system and service are subject to the jurisdiction of the Railroad Commission of the State of California;

"And, basing its order upon the foregoing findings of fact and upon the other statements of fact contained in the preceding opinion, and upon the evidence adduced at the original hearing and rehearing herein,

"It is hereby ordered, that C. J. Klatt be, and he is hereby directed to resume service of water for irrigation use to such persons as were formerly served by the pumping plant located upon the property of said C. J. Klatt, under such reasonable rates, rules and regulations as may be filed with and approved by this Commission; and

"It is hereby further ordered, that the said C. J. Klatt be, and he is hereby directed to file with this Commission, within twenty (20) days after the date of this order a schedule, setting forth such rates, rules and regulations."

The recent case of *Richardson* v. *Railroad Commission*, 191 Cal. 716 [218 Pac. 418], wherein the order of the Commission was annulled, is very similar in its facts. In that case,

in response to the request of neighbors that the owner sell water to them, the owner stated in each case he could only supply them out of his own surplus and when the water was not being used elsewhere. Each consumer was to apply to the owner in each instance and get the water in his turn. The service covered the period from 1913 to 1922. As here, each consumer was to lay his own pipe-line. The rate for the service was first seventy-five cents and then $1 and finally $1.25 per hour. The owner kept no regular accounts and the net income from the service during the entire period varied, being less in some years and in other years slightly more than his outlay in operating expenses without taking into account the depreciation of his plant by use. It was said in that case: "It is conceded by both the petitioner and the respondent herein that if, upon the undisputed facts as presented before the Railroad Commission, it appears that the individual or corporation complained of is not a public utility, any decision or order of the Commission declaring him or it to be a public utility is void as beyond the jurisdiction of the Commission and may be assailed and vacated by means of a writ of review. The rule, however, is that if there is any substantial evidence before the Commission in the proceeding thus sought to be annulled, which would justify its findings to the above effect, its order must stand. . . . 'That the devotion to public use must be of such character that the public generally, or that part of it which has been served and which has accepted the service, has the right to demand that that service shall be conducted, so long as it is continued, with reasonable efficiency under reasonable charges. Public use, then, means the use by the public and by every individual member of it, *as a legal right.* Such is not only the accepted significance of the phrase by the great weight of authority as expounded by Mr. Lewis (Eminent Domain, sec. 164 et seq.), but is the definition repeatedly announced by this court. . . . ' The court also, and in the quite recent case of *Van Hoosear* v. *Railroad Commission, supra,* quoted with approval the further statement in the Allen case that 'To hold that property has been dedicated to a public use is "not a trivial thing" . . . , and such dedication is never presumed "without evidence of unequivocal intention." ' "

Referring to the reasons advanced in the opinion of the Commission for holding that the service was of a public utility character this may be said. It is true that no applicant for water had ever been refused it by the successive owners, for it appears there was always a supply of surplus water. In other words, the fact that the water was never refused is entirely consistent with petitioner's theory that the consumers were to have surplus water only. It is a fact that water was not supplied as an accommodation or as a neighborly act, if by those terms is meant there was no consideration for the water. The water was paid for and we have seen that the amount received just about paid the cost of electricity used in the operation of the pump and that it did not constitute a return on the investment. **[1]** The fact that there was a monetary consideration for the service, especially when considered with the circumstance that the receipts only paid for the electricity, does not prove that the water was not surplus or that the plant was a public utility. (*Allen* v. *Railroad Commission,* 179 Cal. 68, 83, 84 [8 A. L. R. 249, 175 Pac. 466].) The statement that in one instance H. S. Pankey advised a neighbor to set out an orchard refers to John Sebastian. John Sebastian testified that before he put in his trees he went to H. S. Pankey and "I asked if I could get water, asked him how much it would take for the trees; how far I should furr out; how I should put my trees, because Mr. Pankey had put in an orchard and was a good authority on putting in trees." He also stated that he would not have put money into the orchard except upon the promise of a supply of water; that he could not afford it, and that he would have allowed his land to remain idle but for such promise. H. S. Pankey's version is thus given: "Q. Did you ever talk to any of them about their setting out their land in trees, Mr. Pankey? A. Why, yes; I talked to Mr. Sebastian. He wanted to know if I could furnish him water if he had orange trees on his ground and I told him he could have the water when it was surplus." Assuming John Sebastian was "advised" to plant his orchard by H. S. Pankey, the evidence does not negative the proposition that the water was to be surplus nor prove, under the circumstances here shown, that H. S. Pankey intended to dedicate the water supply to a public use. Concerning a similar conversation in *Richardson* v.

*Railroad Commission, supra,* the court said: "The mere recital of this interview should suffice to show its insufficiency as any basis for a finding that the petitioner was thereby intending to declare that his water plant was a public utility or to dedicate it to the public use as such."

It is idle to hold that the intent was clear on the part of H. S. Pankey to render a continuous and permanent service to the consumers, regardless of whether the supply was more than he needed for his own use or whether the supply gave out entirely; or that it was necessary in order to prevent the plant from becoming a public utility that he notify the consumers the service was but temporary or as a mere accommodation. Nor is the claim that surplus water only was to be supplied disposed of by the argument that there always was in fact such a surplus. It is a sufficient answer to the argument that as the plant was at all times handled as a business proposition it must have been a public utility, to point out that it was a business proposition only in the limited sense that approximately the charge for service was sufficient to defray the cost of electricity. We do not assume that in every case the method of service by rotation would negative dedication; but when considered with the other circumstances that conclusion is more consistent than one of dedication based on the testimony of John Sebastian that H. S. Pankey told him he could get the water when he wanted it. It is a fact, as already stated, that the service was not rendered as a mere accommodation or as a neighborly act; but the service did depend on whether the owner could spare the water.

We have thus far considered the matter from the standpoint that surplus water only was to be supplied to the consumers. But under the evidence it would make no difference if the element of surplus water did not enter. For if the engagement comprehended the entire supply of water it would be necessary to prove an unequivocal intention on the part of the owners to dedicate it to a public use, or conduct indicative of such intention. No such proof is shown by the record. There is no evidence upon which a finding that the first well had been operated as a public utility could be based and there being no independent dedication of the new well respondent's contention cannot be sustained.

[2] The law requires that there shall be clear proof of an unequivocal intention to dedicate property to a public use before it can be taken from the owner. [3] In the examination of the evidence we have kept in view the rule that its probative effect is left to the determination of the Commission and that our survey is limited to the legal question whether, conceding the facts relied upon by the Commission to be true, a case of dedication is made out. Giving to such facts their full import (there is no finding of unequivocal intention) we think no more is shown than that for a number of years petitioner and his predecessors in interest furnished water to the consumers under private contracts, and that the record is destitute of any evidence which even tends to show an unequivocal intention or conduct on the part of the owners from which a dedication of the water to a public use can be inferred.

The authorities cited by respondent were considered in the Richardson case and no useful purpose will now be served by discussing them. The facts in those authorities showed either an unequivocal intention to dedicate or a dedication by conduct, including dedication evidenced by incorporation under a water act (*Traber* v. *Railroad Commission,* 183 Cal. 304 [191 Pac. 366]), by the invocation of eminent domain (*Producers Transp. Co.* v. *Railroad Commission,* 176 Cal. 499 [169 Pac. 59]), by application to the Commission for discontinuance of the service (*Van Hoosear* v. *Railroad Commission,* 184 Cal. 553 [194 Pac. 1003]), by application of a private water corporation to the board of supervisors to fix the rates (*Franscioni* v. *Soledad L. & W. Co.,* 170 Cal. 221 [149 Pac. 161]), by contract that the rate for water shall be "the rates fixed by law" (*Palermo L. & W. Co.* v. *Railroad Commission,* 173 Cal. 380 [160 Pac. 228]), and where a corporation whose articles of incorporation declare its purposes to be that of utilizing the water of a river for sale for use generally in cities and towns within a certain zone and its contracts expressly provide that the water furnished be subject to "legal rates," and sells water to the general public thereunder, and contract consumers accepted and paid the rates established by the Commission, the water company as to all of its water users was a public utility, and that such consumers as complained are estopped to deny it (*Brewer* v. *Railroad Commission,* 190 Cal. 60 [210 Pac. 511]).

[4]    H. S. Pankey developed water on his property in the old well. The neighbors were owners of small tracts of land and they were allowed to lay pipes and use the water when it was surplus. Each consumer was required to apply for the water, was allowed to take it in his turn, and was never seriously inconvenienced by occasional delays in securing permission to use the water. The service was thus uniformly furnished under these conditions for about ten years. During this period there was no deviation in the arrangement, and there never was any lack of surplus water. The money collected for the service was merely sufficient to pay for the electricity used. No consumer ever questioned the arrangement or claimed that the owner had dedicated the water to the public. When the supply of water from the old well was diminished and the owner proposed that the consumers become part owners in the new well which had been sunk none of the consumers claimed he was entitled to the service as from a public utility. To declare that the water has been dedicated to a public use is to take the property of petitioner in the absence of intent, declaration, or act on his part to relinquish his right thereto.

This conclusion renders it unnecessary to consider the scope of the order in connection with the finding—whether it comprehends the entire water supply or the portion thereof which may be surplus.

While it is important that consumers entitled to the service of water shall not be deprived thereof, it is also important that the property of the citizen shall not be taken from him except in the presence of a clear legal necessity.

The points presented call for no further discussion.

Order annulled.

Lennon, J., Kerrigan, J., Myers, J., Seawell, J., Waste, J., and Wilbur, C. J., concurred.