[S. F. No. 19690. In Bank. Feb. 2, 1959.]

CALIFORNIA WATER AND TELEPHONE COMPANY
(a Corporation), Petitioner, v. PUBLIC UTILITIES
COMMISSION OF THE STATE OF CALIFORNIA
et al., Respondents.

of it to public use, confining the use to such territory as he sees fit.

Claude N. Rosenberg, Tadini Bacigalupi, Jr., and Bacigalupi, Elkus & Salinger for Petitioner.

Everett C. McKeage, Chief Counsel, Roderick B. Cassidy, Assistant Chief Counsel, Cyril M. Saroyan, Senior Counsel, Rita L. Heiser, Assistant Counsel, Twohig, Weingarten & Schmidt and Saul M. Weingarten for Respondents.

SCHAUER, J.—This is a proceeding to review an order of the Public Utilities Commission which purports to modify the terms of a certain contract between petitioner and respondent Sawyer, and directs petitioner to reexecute the contract "as modified" by the commission and thereupon to specifically perform such "contract." We have concluded that the commission has acted in excess of its jurisdiction and that the order under review must be annulled.

Petitioner is a public utility engaged in the business of supplying water service to consumers in certain portions of Monterey County. The contract involved provides for the extension of petitioner's water mains and services into unimproved land which respondent Sawyer proposes to subdivide and which petitioner considers outside its dedicated service area. The commission premises its authority to make the subject order on its finding that petitioner has dedicated its service to the territory involved. Petitioner contends that the evidence is insufficient to sustain the finding of public dedication as to the subject area and that petitioner is therefore being deprived of its property without compensation in violation of its constitutional rights. For reasons hereinafter indicated we have concluded that petitioner's argument should be sustained. Because of the nature of the issue it is necessary to summarize all of the evidence which conceivably could tend to support the commission's holding.

In 1948 petitioner's admitted territory of dedicated service extended as far south as the southern boundary of an area known as Carmel Highlands. In that year respondent Sawyer purchased some 1,146 acres of land lying immediately south of Carmel Highlands. This land is known as the Victorine Ranch and, at the time of the Sawyer purchase, apparently contained but two dwelling houses and was in fact, as the name implies, a ranch or farm and not a residential area.

Following oral discussions with certain officers and employes of petitioner and after receiving letters from the manager of its Monterey Peninsula Division to the effect that ''our installations at Carmel Highlands can be extended to the Victorine Ranch with storage tanks which would supply any development that might be contemplated in this area,'' and that ''It would not be necessary to supplement our present supply from any other sources,'' respondent Sawyer proceeded to subdivide some 23 acres, hereinafter referred to as Tract Number 1, install a water distribution system therein, and construct an 8-inch water main from that distribution system to a 3-inch water main of petitioner's at its termination point some 400 feet north of the southern boundary of Carmel Highlands. This work was completed in October, 1948, and petitioner's local representatives prepared and presented to Sawyer for his consideration and signature a certain proposed contract for the extension of petitioner's service. However, neither Sawyer nor petitioner signed the document.

This unsigned proposal apparently contemplated the extension of petitioner's service to Tract Number 1 as an area contiguous to that being served by petitioner and also contained proposed agreements for possible later extensions of service to future subdivisions of the balance of the Victorine Ranch area. As to Tract Number 1 the proposed contract provided, in substance, that upon respondent Sawyer's transferring to petitioner ownership of the distribution system and 8-inch pipeline which he had constructed, petitioner would extend its service to Tract Number 1 as a public utility and would refund ''the actual cost of the installation of said facilities'' in conformance with petitioner's then effective subdivision main extension rule. Such extension rule (designated Rule and Regulation 19 B) provided, in effect, that applicants for main extensions to serve subdivisions would pay the construction costs of the extension and would receive from petitioner, for a period not to exceed 10 years, an annual

refund of 35 per cent of the gross revenues collected from consumers within the subdivision.

The unsigned document also provided that respondent Sawyer would, as a condition precedent to petitioner's being obligated to supply water to areas other than Tract Number 1, construct at his own expense some 5,000 feet of 8-inch pipeline running from the northern terminus of the 8-inch pipeline installed by Sawyer to the southern terminus of petitioner's certain 8-inch pipeline in Carmel Highlands. There was no refund provision concerning the 5,000-foot pipeline.

The parties, having failed to agree, resumed negotiations and on July 8, 1949, reached agreement. They signed a contract which provided, among other things, that respondent Sawyer in effect transferred to petitioner, without obligation to refund, the pipeline and Tract Number 1 distribution system which he had constructed. Petitioner then connected its 3-inch main with the 8-inch main constructed by Sawyer and commenced service to Tract Number 1. Petitioner concedes, and has conceded throughout, that Tract Number 1, but only Number 1, thereby became and is now within its dedicated public service area. The order of the commission presently under review does not concern the terms of petitioner's service to Tract Number 1; it relates solely to the nature of petitioner's obligation, if any, to extend its mains and services to new subdivisions proposed to be created in other areas of the Victorine Ranch.

Under the July, 1949, contract petitioner conditionally agreed, in effect, to extend its mains and services from time to time to other contemplated subdivisions of the Victorine Ranch land lying below the 600-foot contour. Such main extensions were to be made in accordance with petitioner's Rule and Regulation 19 B, *provided that Sawyer, as a condition precedent,* deposited with petitioner $20,000 toward the cost of the installation by petitioner rather than by Sawyer of the aforementioned 5,000 feet of 8-inch pipeline running from the northern terminus of the 8-inch pipeline in Carmel Highlands. Sawyer agreed to pay petitioner's actual construction costs and construction was to begin upon deposit of the $20,000. Petitioner agreed to refund any portion of the $20,000 that should prove in excess of the actual construction costs, but there was no provision for refund of the actual construction costs themselves. Respondent Sawyer agreed to commence accumulating the $20,000 by opening an escrow savings account and depositing the sum of $1,500

therein concurrently with each and every sale of a lot in Tract Number 1.

Paragraph 9 of the agreement provides that "This agreement shall at all times be subject to such changes or modifications of the Public Utilities Commission . . . as said Commission may from time to time direct *in the exercise of* [its] *jurisdiction.*" (Italics added.) Such provision is required by and was inserted pursuant to the commission's General Order Number 96. General Order Number 96 also states that no public utility such as petitioner "shall hereafter *make effective* any contract or arrangement for the furnishing of any public utility service . . . under conditions other than the . . . conditions contained in its tariff schedules on file and in effect at the time, unless it first obtain the authorization of the Commission to carry out the terms of such contract or arrangement . . . Each such contract shall contain a provision indicating the understanding of the parties that it shall not become effective until such authorization of the Commission is obtained." (Italics added.) The latter provision was not inserted in the subject contract and petitioner did not submit the contract for the commission's approval but, as hereinafter shown, it was not until 1954 that Sawyer requested petitioner to "make effective" the contract for service beyond the original contiguous areas of Tract Number 1.

Petitioner also agreed to apply to the commission, within 60 days after execution of the contract (July 8, 1949), for a certificate of public convenience and necessity to render water service as a public utility in that portion of the Victorine Ranch lying below the 600-foot contour. Petitioner has not made such application and holds no certificate or franchise to serve the Victorine Ranch area.

In 1954 respondent Sawyer sought water service for certain areas of the Victorine Ranch other than Tract Number 1. Petitioner advised Sawyer that it would not extend its mains or services unless and until Sawyer complied with the condition precedent and, as specified in the contract, deposited with petitioner $20,000 for the construction of the 5,000-foot pipeline. Sawyer did not deposit the $20,000 but, on November 29, 1954, filed a complaint with the commission. The complaint alleged the substance of the foregoing facts, among other things, and prayed that petitioner be required to reduce its demands and extend service to the entire Victorine Ranch territory in accordance with its Rule and Regulation 19 B. Petitioner filed an answer which, among other

things, contested the commission's jurisdiction to grant the prayed-for relief. Hearings were held during April and July, 1955.

After the case was submitted but prior to a decision, the parties, on May 21, 1956, signed a proposed compromise agreement. LeForust, Inc., to whom respondent Sawyer had previously sold certain undeveloped portions of the Victorine Ranch, was a party to such agreement. This proposed compromise evidenced a full meeting of the minds of the parties and a clear statement of their intended contractual rights and obligations but, inasmuch as under General Order Number 96, hereinabove quoted, the proposed agreement would not be fully valid and *effective* without approval of its terms by the Public Utilities Commission, the parties expressly declared such approval to be a prerequisite to *any effectiveness* of the proposed agreement. The agreement provided that in place of meeting the condition theretofore agreed upon (the immediate deposit of $20,000 to be credited against Sawyer's obligation to pay *all of* the actual costs of constructing the 5,000-foot pipeline specified in the 1949 agreement) respondent Sawyer would ''pay to'' petitioner $24,000 but would not be obligated to pay any further amount toward petitioner's costs of making the necessary extension to its facilities. Petitioner agreed that upon receipt of the $24,000 it would proceed to construct an 8-inch pipeline some 560 feet in length connecting the 8-inch pipeline originally installed by Sawyer with a certain 8-inch pipeline of petitioner's which terminates on ''Lower Walden Road.'' This latter pipeline is not 8 inches in diameter throughout its entire length; it contains some 1,500 feet of smaller pipe. Petitioner agreed to replace the smaller pipe so as to provide a continuous 8-inch main leading to the Victorine Ranch.

The $24,000 was, of course, intended to substantially defray petitioner's construction costs for the addition but was stipulated in the compromise agreement to be a ''firm amount'' not subject to readjustment upon determination of petitioner's actual construction costs. It was also agreed that as to any future main extensions—i.e., extensions *after its service would have become dedicated to the new area*—petitioner's main extension rule in effect at the time of such extension would be applicable, rather than the Rule and Regulation 19 B which was in effect at the time of the 1949 agreement.[1]

---

[1] In 1954 the commission promulgated a new main extension rule. Its refund provisions are considered less onerous to the utility.

Respondent Sawyer also agreed to request the commission to dismiss his complaint with prejudice and approve the 1949 agreement as amended by the 1956 agreement. In this regard the 1956 agreement provided as follows: "It is mutually agreed by the parties hereto that unless and until the Commission shall have, upon the application of [Sawyer] . . ., dismissed said complaint with prejudice and approved the 1949 Agreement, as amended hereby, all in such manner as to make such dismissal and approvals full, final and unconditional and subject to no further change without the consent of the parties hereto, this Agreement shall be of no force or effect and the rights, duties and obligations of the parties hereto shall remain as they were prior to the execution hereof." Except as expressly proposed to be modified, the agreement of July 8, 1949, was ratified and affirmed.

Pursuant to the terms of the 1956 proposed compromise agreement, Sawyer, on May 23, 1956, submitted the contracts to the commission for its approval and requested dismissal of his complaint with prejudice.

On August 29, 1956, the commission rendered its decision. Its opinion notes petitioner's argument to the effect that petitioner has not dedicated its public service to the Victorine Ranch properties other than Tract Number 1, and that the commission therefore has no jurisdiction to order an extension of service or regulate the conditions upon which petitioner's mains may be extended. The commission opinion, however, concludes that petitioner is subject to "whatever order in this proceeding [the commission] . . . may deem appropriate with respect to the facilities and service contemplated by [the 1949] . . . agreement *and by the [1956] amendments thereto.*" (Italics added.) This conclusion is apparently based on (1) the commission's interpretation of the contracts involved and (2) its finding "that [petitioner] . . ., by execution of the 1949 agreement *and the 1956 amendments thereto,* has unequivocally indicated its intent to dedicate and *has in fact dedicated* its service, as set forth in said amended agreement, to the balance of the Victorine Ranch properties." (Italics added.) The above quoted finding, as appears from the above recited facts and as is hereinafter explained in more detail, is untenable.

The commission opinion then turns to what it terms "a consideration of the merits" of the agreement and concludes that petitioner's main extension rule in effect in 1949 should apply to future extensions and that Sawyer should not be

required to pay the $24,000 contemplated in the 1956 agreement; that Sawyer should be required to pay no more than the actual cost of constructing the 560 feet of 8-inch pipe connecting the pipeline originally constructed by Sawyer with petitioner's "Lower Walden Road" pipeline, that petitioner should stand the cost of removing the "bottlenecks" in the latter pipeline. Placing emphasis on paragraph 9 of the 1949 agreement, which states that the agreement shall "at all times" be subject to modification by the commission "in the exercise of [its] jurisdiction," the commission entered its order: (1) Denying petitioner's motions to dismiss the Sawyer complaint. (2) Denying Sawyer's request for approval of the agreements and dismissal of his complaint. (3) Directing petitioner "to carry out the terms and conditions of its agreement of July 8, 1949, as amended by its agreement of May 21, 1956 . . . *as modified to the extent and in the manner set forth in the preceding opinion* . . ." (4) Directing petitioner "*to re-execute said agreement* of July 8, 1949, *as amended by the agreement of May 21, 1956, and as modified by this order* . . ." (Italics added.) (5) Denying all other relief prayed for by Sawyer, with the exception of the institution of an investigation by the commission into petitioner's "Monterey subdivision main extension contracts and practices," such investigation having already commenced. A petition for rehearing was denied.

Petitioner contends that the commission has acted in excess of its jurisdiction in that the commission's order purports to modify a private contract and order its re-execution and specific performance "as modified." ■ As stated in *Atchison, etc. Ry. Co.* v. *Railroad Com.* (1916), 173 Cal. 577, 582 [160 P. 828, 2 A.L.R. 975], "the . . . commission is not a body charged with the enforcement of private contracts. [Citation.] Its function . . . is to regulate public utilities and compel the enforcement of their duties to the public [citation], not to compel them to carry out their contract obligations to individuals." ■ The commission cannot "modify" a public utility's contract or order a public utility to perform a contract, whether "modified" or "unmodified." ■ It may, however, within the limits of its jurisdiction, order a public utility to render certain services on certain terms and conditions, and in so doing it is not bound by the terms of a utility's previously negotiated contracts. (*Cf. Motor Transit Co.* v. *Railroad Com.* (1922), 189 Cal. 573, 581 [4] [209 P. 586].) The commission argues that the record supports its

determination that petitioner has dedicated its service as a public utility to the entire Victorine Ranch area rather than just to Tract Number 1 therein, and that consequently the order under review merely utilizes various provisions of the contracts in the course of directing petitioner to extend its mains and services to the balance of the ranch on conditions which the commission has found reasonable.

The law is clear that an order directing a public utility to devote its property to some other use than the public use to which the utility has dedicated the property cannot be justified as an exercise of the police power. As appears from *Pacific Telephone etc. Co.* v. *Eshleman* (1913), 166 Cal. 640, 680 [137 P. 1119, Ann.Cas. 1915C 822, 50 L.R.A. N.S. 652] : "[I]n dealing with public utilities, regulation of use within the dedicated use is as far as the police power may be extended, and . . . when the regulation exceeds this, it is always void for unreasonableness and may, depending upon the form and character of the order, be also void as an attempt to take property without compensation . . ." In that case the commission had ordered Pacific Telephone Company to "permit a connection between its long distance lines and the local lines of the [competing] . . . companies [Tehama County Telephone Company, and Glenn County Telephone Company], under which, by the use of the switchboards, operators, and lines of the Pacific Company, its property and its agencies, the petitioning companies and their subscribers would have the same rights to all the long distance instrumentalities of the Pacific Company as its subscribers and patrons." (P. 669 of 166 Cal.) In opinions annulling the commission's order it was pointed out (pp. 669-670, 690-701) that the Pacific Company had dedicated its property to telephone service conducted by itself for the benefit of its own patrons and to the service of local companies in noncompeting territory, but had not made such dedication to the use of rival and competing companies, and held (pp. 686-687, 702-703) that to compel it to provide service to such companies would be to subject its property to a new use which would constitute a taking without compensation first being paid to the owner as required by the California Constitution.

This court has likewise recognized that a public utility may limit its dedication to a territorial area. (*Hollywood C. of C.* v. *Railroad Com.* (1923), 192 Cal. 307 [219 P. 983, 30 A.L.R. 68] ; *Atchison, etc. Ry. Co.* v. *Railroad Com.* (1916), *supra*, 173 Cal. 577; *Del Mar Water, etc. Co.* v. *Eshleman*

(1914), 167 Cal. 666 [140 P. 591, 948].) In the last cited case we annulled an order which directed a water company to extend its pipeline and render service to a certain individual. (See pp. 678-683 of 167 Cal.) Although there was some doubt whether the company was a public utility, such was assumed to be the fact and this court based its decision on failure of the evidence to show, and of the commission to find, that the individual concerned was within the territorial area to which the company had dedicated its public service. ■ The court further commented on the limited nature of the supply of water itself, and declared (p. 681) that "There can be no doubt, therefore, that the owner of a water supply may make a limited dedication of it to public use, *confining the use to such territory as he sees fit.* Nor can there be any doubt that one owning a water supply is not compelled to dedicate all of it to public use, or that he may dedicate a part of it, only, to such use . . . Accordingly, our decisions have recognized and have repeatedly declared the right of a water company to make such limited dedication and to decline to furnish its water to persons not within the area it has undertaken to serve. [Citations.]" (Italics added.)

The commission, however, argues that certain language appearing in the decision of *Hollywood C. of C.* v. *Railroad Com.* (1923), *supra*, 192 Cal. 307, indicates that a public utility water company may be ordered to expand into territory outside its dedicated service area in the interest of public convenience and necessity. As applied to the circumstances of the case at bar the argument is without merit. In the cited case this court held (pp. 313-314) that the commission is without jurisdiction to order a street railway company to extend its lines into new territory in which it has no municipal franchise to operate. We recognized (pp. 312-313) that the territorial scope of a utility's dedication might be measured by the territorial scope of the municipal franchises the utility had acquired, but reasoned that "whereas these other utilities [water, gas, electric, telephone] are given franchises [and hence have dedicated their services] to supply the inhabitants of the particular community," the territorial scope of the railway company's franchise included only the land over which the company had obtained permission to run its lines.

This court further stated among other things (p. 312 of 192 Cal.) : "The argument of the Railroad Commission seems to be predicated upon the erroneous assumption that a street railway company's public duty is analogous to the duties of a

water, gas, electric power, or telephone company, *which are required to expand their facilities to meet the demands of a growing community.* (*Lukrawka* v. *Spring Valley Water Co.* [1915], 169 Cal. 318 [146 P. 640, Ann.Cas. 1916 D 277].)" (Italics added.) Respondent commission now suggests that the italicized portion of the above quotation establishes that a water company may be compelled to extend its service beyond its dedicated area. But as hereinafter shown a reading of the court's opinion shows no support for the commission's suggestion.

The Lukrawka case involved a corporation which was organized "under the act of April, 1858 [Stats. 1858, p. 218], for the purpose of supplying the city and county of San Francisco and the inhabitants thereof with a sufficient supply of water." (P. 321 of 169 Cal.) Certain residents of San Francisco sued the company to compel it to extend its water mains and provide them with water. The court pointed out (p. 324) that "The act of 1858 in express terms confers on corporations accepting the franchise extended under it, the privilege of using the streets of the municipality in which it has undertaken to operate for laying its pipes and conduits. The respondent could acquire no right to engage in the business of supplying water to the city and county of San Francisco, with an easement over all the streets of the municipality, unless under a franchise granted by the state for that purpose and with such a right. It was for the benefit of the public that the franchise was extended; to secure to the municipality . . . and its inhabitants an adequate supply of water . . . [P. 325.] This was the purpose and this the condition upon which the franchise was offered and when it was accepted by the respondent it constituted a contract between the state and the respondent under which the rights, duties, and responsibilities of each were fixed . . . The franchise was not offered, nor could it be accepted, with any limitation as to the area to be fixed by the corporation organized under the act within which in the municipality it would furnish water to its inhabitants." The holding was that by accepting the franchise the water company had also assumed the obligation "to anticipate the natural growth of the municipality it had undertaken to serve as a whole and to take reasonable measures to have under its control a sufficient supply of water and make gradual extensions of its distributive system to meet the reasonable demands for water by the growing community." (P. 325.) The court further com-

mented (p. 326), that it had not been cited to any authority holding that a corporation "operating under the terms of a *franchise such as is involved here*" (italics added) is not required to extend its water system into new territory in the city of its franchise. There is no suggestion that the commission could require the water company to extend its lines and services to some other city or new community lying beyond the bounds of the franchise it had accepted. It is thus clear that in the Lukrawka case the court was concerned with the peculiar obligations of a water company which had been organized and had accepted a franchise under the particular statute there involved (Act of April, 1858), rather than with any general power of the public utilities commission to order a public utility to extend its service beyond the territorial limits of its dedicated area, and that neither the Lukrawka nor the Hollywood case supports the commission's suggestion that it has such power.

▋ To summarize, the above cited cases are uniformly to the effect that a public utility may not be compelled to extend its service beyond the territorial limits of its dedication. This is true regardless of the nature of the utility involved. ▋ In measuring the territorial scope of a utility's dedication a fundamental distinction exists between railway companies and other utilities such as water, gas, electric power and telephone companies. This distinction stems from the fact that the latter utilities normally extend their lines to their customers, whereas a railway company's customers bring themselves to the utility. This distinction is most apparent in cases like Hollywood and Lukrawka, wherein a public utility has acquired a franchise to operate within a municipality. The extent and terms of such franchises constitute persuasive evidence of the territorial scope of the utility's dedication. When a railway company obtains a franchise to operate within a municipality it normally merely acquires permission (and impliedly obligates itself to the public) to run its lines over certain specified streets or strips of land; it does not acquire permission or obligate itself to extend its lines should the municipality grow in the future. The territorial scope of a railway's dedication is limited to a relatively narrow strip of land and, from the nature of the business, it is up to the public to bring itself to the railway company's line. Such is normally not the situation with respect to water companies and like utilities which extend their lines to individual customers within the

areas to which they are dedicated. ■ When a water company acquires a franchise to operate within a municipality, it normally (although not necessarily) acquires permission (and impliedly obligates itself to the public) to extend its lines along all the streets in the municipality, including streets to be built in the future, so that it may bring its service to all customers embraced within the territorial limits of the municipality. It follows that when a water utility has dedicated its service to the inhabitants of a municipality, the territorial scope of its dedication may ordinarily be measured by the municipality's boundaries, and, in a proper case, it may be required to make reasonable extensions of its lines to accommodate the increased demands of a growing municipality. But it is only within the territorial scope of its dedication that a water utility, or any other utility, may be compelled to extend its lines.

■ The commission also suggests that as a matter of law petitioner must be held to have dedicated its service to the balance of the Victorine Ranch properties, because it claims the right to extend its service into that territory. Such reasoning, which transmutes a claimed privilege into an avowed obligation, is clearly untenable; this is even more obviously true here where the claimed privilege or, more accurately, contemplated possible future service, was itself expressly made conditional on explicit commission approval of the extension plan as tentatively offered.

The next issue is whether the evidence is sufficient to support the commission's finding that petitioner had dedicated its public service to the territory involved. If there was any evidence[2] before the commission that could support its finding of dedication, such finding will not be disturbed. (*Kern County Land Co.* v. *Railroad Com.* (1934), 2 Cal.2d 29, 35 [3] [38 P.2d 401, 39 P.2d 402]; *Western Canal Co.* v. *Railroad Com.* (1932), 216 Cal. 639, 646 [1] [15 P.2d 853]; *S. Edwards Associates* v. *Railroad Com.* (1925), 196 Cal. 62, 70 [4] [235 P. 647]; *Butte County W. U. Assn.* v. *Railroad Com.* (1921), 185 Cal. 218, 231 [8] [196 P. 265]; *Van Hoosear* v. *Railroad Com.* (1920), 184 Cal. 553, 555 [2] [194 P. 1003]; see also *California Portland Cement Co.* v. *Public Util. Com.*

---

[2]For the purposes of this argument we do not consider the possible effect of section 1760 of the Public Utilities Code. (See *Southern Pac. Co.* v. *Public Utilities Com.* (1953), 41 Cal.2d 354, 361 [260 P.2d 70]; *Southern Calif. Edison Co.* v. *Railroad Com.* (1936), 6 Cal.2d 737, 748-750 [7, 9, 11] [59 P.2d 808].)

(1957), 49 Cal.2d 171, 175 [3] [315 P.2d 709] ; *Southern Calif. Edison Co.* v. *Railroad Com.* (1936), *supra,* 6 Cal.2d 737, 747 [6].) Petitioner has admittedly dedicated its property to public use in various areas of Monterey County. The question is whether the evidence supports the finding that petitioner has made such a dedication with respect to the balance of the Victorine Ranch area. As stated in *Allen* v. *Railroad Com.* (1918), 179 Cal. 68, 85 [175 P. 466, 8 A.L.R. 249], "To hold that property has been dedicated to a public use is 'not a trivial thing' [citation], and such dedication is never presumed 'without evidence of unequivocal intention.' " (See also *Trask* v. *Moore* (1944), 24 Cal.2d 365, 373 [3] [149 P.2d 854] ; *Klatt* v. *Railroad Com.* (1923), 192 Cal. 689, 702 [2] [221 P. 926] ; *Richardson* v. *Railroad Com.* (1923), 191 Cal. 716, 721 [3] [218 P. 418].) However, such unequivocal intention need not be expressly stated ; it may be inferred from the acts of the owner and his dealings and relations to the property. (*S. Edwards Associates* v. *Railroad Com.* (1925), *supra,* 196 Cal. 62, 70 [2].) Dedication is normally evidenced by some act which is reasonably interpreted and relied upon by the public as a "holding out" or indication of willingness to provide service on equal terms to all who might apply. (See *S. Edwards Associates* v. *Railroad Com.* (1925), *supra,* 196 Cal. 62, 70 [3], 71 [7] ; *Traber* v. *Railroad Com.* (1920), 183 Cal. 304, 312 [191 P. 366] ; *San Leandro* v. *Railroad Com.* (1920), 183 Cal. 229, 234 [2] [191 P. 1] ; *Producers Transp. Co.* v. *Railroad Com.* (1917), 176 Cal. 499, 503-505 [169 P. 59] ; *Camp Rincon Resort Co.* v. *Eshleman* (1916), 172 Cal. 561, 563-564 [158 P. 186] ; *Thayer* v. *California Development Co.* (1912), 164 Cal. 117, 126-132 [128 P. 21].) If the evidence reveals any acts on the part of petitioner which were reasonably relied upon by the public as an expression of petitioner's willingness to extend its mains to the uninhabited balance of the Victorine Ranch and render public utility service therein whenever members of the public should occupy that area and request such service, the commission's order will not be annulled.

The commission in its written opinion states: "We . . . find that [petitioner] . . . , by execution of the 1949 agreement *and the 1956 amendments thereto,* has unequivocally indicated its intent to dedicate and *has in fact dedicated* its service, as set forth in said amended agreement, to the balance of the Victorine Ranch properties." (Italics added.) But the mere signing of the 1949 and 1956 agreements

furnishes no evidence of public dedication. For one thing, the 1956 agreement has not become effective and the commission errs to the extent that it treats that agreement as binding upon petitioner. That agreement clearly states that it "shall be of no force or effect" unless and until the commission "shall have . . . dismissed [the Sawyer] . . . complaint with prejudice and approved the 1949 Agreement, as amended hereby . . ." Neither of the conditions precedent has occurred and the 1956 agreement is inoperative. Furthermore, it is manifestly arbitrary and unreasonable to hold that the mere signing of these agreements evidenced a dedication of property to public use in a previously nondedicated area, so as to *ipso facto* empower the commission to compel the extension of petitioner's mains on conditions other than those specified by petitioner in the agreements, and without which petitioner, in the exercise of its managerial judgment (*cf. Pacific Tel. & Tel. Co.* v. *Public Utilities Com.* (1950), 34 Cal.2d 822, 828-829 [5, 6] [215 P.2d 441]), would not have signed the agreements in the first place.

*Butte County W. U. Assn.* v. *Railroad Com.* (1921), *supra,* 185 Cal. 218, 228-229 [4], cited by the commission, is not persuasive to the contrary. In that case this court, despite protest by certain "old consumers" of a water utility, affirmed an order of the commission directing the utility to supply water, beginning with the year 1920, to some 14,400 acres of land not theretofore served by it. In September, 1919, the utility had contracted with the owners of the 14,400 acres to supply such service. In the spring of 1920 it became evident that there was danger of a water shortage due to light rainfall during the preceding winters. Before the water company actually commenced deliveries to the 14,400 acres the company's pre-1920 consumers filed a complaint with the commission, alleging that the company would not have enough water to serve both their lands and the 14,400 acres of new lands, and asking the commission to direct the company not to supply the latter. The owners of the 14,400 acres intervened, alleging that they had been accepted by the water company as consumers. The commission, on the ground that the interveners occupied the status of consumers and were therefore, as a matter of law, entitled to share pro rata in the available supply, ordered the company to serve them.

Although in affirming the commission's order this court held that the record supported the commission's conclusion

that the owners of the 14,400 acres occupied the status of consumers, i.e., persons whom the water company was obligated to serve, the holding did not rely on the mere creation of the September, 1919, contract. The opinion states (at pp. 228-229 of 185 Cal.): ''The facts in the matter are . . . that in September, 1919, the company and the owners of the new lands contracted for service for those lands; that the company thereupon extended its system and the owners prepared their land, both at very considerable expense; and that prior to January 1, 1920, pursuant to the company's rules, the respective owners had made application to it for water for the ensuing year, and those applications had been accepted, and the owners had paid the company's charges.

''These facts are not disputed, and upon them certainly the owners had become consumers, provided only the company had authority to admit them as such. . . . The relation of public utility company and consumers was established as soon as the company came under obligation to serve and the owners came under obligation to take. Both these obligations had been assumed by the respective parties by January 1, 1920, so far as they could assume them. . . .'' In the Butte case the water company had actually extended its system into the new territory and the owners of the 14,400 acres had performed all conditions precedent to the water company's obligation to commence water deliveries. The case is clearly not authority for the proposition that petitioner here dedicated its service to the entire Victorine Ranch by merely signing the 1949 and 1956 agreements.

The commission contends also that the record supports an implied finding that petitioner had dedicated its service to the territory in question prior to the signing of the contracts. The commission's written opinion, as well as its order denying rehearing, indicate that it relied to some degree upon evidence that petitioner serves water to three houses located on the Victorine Ranch a short distance south of Tract Number 1.

Two of those houses existed at the time Sawyer acquired the Victorine Ranch and are served water pursuant to a 1943 contract with their then owner, Joe Victorine. The record reveals that when Victorine applied to petitioner for water service in 1943 the matter was the subject of correspondence between petitioner and the commission. In a letter to the commission dated March 8, 1943, petitioner advised that it was willing to serve Victorine only on condition that

it would not be interpreted "as an extension of the company's service area or the dedication of any of the company's water to the Victorine service or the area in which it is located." That area, of course, was farm land, not a growing residential area. By letter of April 12, 1943, the commission suggested to Victorine that "the service be covered by an agreement in order that there can be no cause for future misunderstanding concerning it." Such a contract was entered into and expressly provides that the service is to be temporary in character and to meet an emergency, and is to be supplied from surplus waters; that petitioner may terminate the service at any time upon one year's written notice, and that neither Victorine nor any successor in interest of his shall acquire any right to receive water except on such temporary basis; that "no water is dedicated to any such uses of Victorine or of the present or future occupants of said residences [sic] or said residences or said real property or any part thereof." By the terms of the contract Victorine agreed to, "at his own cost and expense, furnish and install pipe necessary to accept delivery of water from [petitioner] . . . within [petitioner's Carmel Highlands] . . . service area." There is nothing to indicate that the pipe installed by Victorine became the property of petitioner. Petitioner's rendition of service to the two Victorine ranch houses certainly does not evidence a willingness to assume public utility obligations to all potential inhabitants of the 1,146-acre Victorine Ranch as a residential subdivision area.

The third house referred to by the commission is owned by one Andrews. It appears that in 1954 Andrews was negotiating with Sawyer for the purchase of two acres immediately south of Tract Number 1. Sawyer inquired whether petitioner would serve the property and was informed that petitioner would not serve any area outside of Tract Number 1 until Sawyer complied with his obligation under the 1949 contract. Finally, however, an arrangement ·was worked out between Sawyer and petitioner whereby the property could be served under a private and limited contract. Pursuant to that arrangement Andrews, *not petitioner*, ran a pipe from the Andrews home to petitioner's mains *in Tract Number 1,* at which point delivery is made and metered. Also pursuant to that arrangement, Sawyer deposited $2,500 from the proceeds of his sale to Andrews in the escrow account provided for by the 1949 contract. Even if we should assume that petitioner thereby dedicated its service as a public utility to

this single residence located on the outskirts of Tract Number 1, such service cannot be construed as a representation to the public that like service will be provided all who purchase lots in future subdivisions yet to be developed by Sawyer. The very nature of the arrangement made negates any such inference.

 The commission asserts that its finding of public dedication was particularly based upon the testimony of one Neill, who was petitioner's division manager in the Monterey area from 1940 to 1943. Neill testified to the effect that at the time he was connected with petitioner both he and his superiors considered petitioner obligated to serve "the entire Monterey Peninsula, the subdividable land in Carmel Valley from the Mathiot Ranch on down. . . . the Coast line down to and including the [Carmel] Highlands . . ." The Victorine Ranch, of course, lies *beyond* and immediately south of Carmel Highlands. At other times during his examination Neill made statements to the effect that the entire Victorine Ranch was within what he and his superiors considered to be petitioner's "service area." It is clear from Neill's testimony that he used the term "service area" to include all territory into which he expected petitioner, at some future time, to expand. For instance, he included within petitioner's "service area" territory that was then being served by three other water systems which he expected petitioner would eventually absorb. Neill's testimony thus amounts to no more than a statement of his own 1943 conclusion as to what petitioner probably would do in the future. He testified to no acts which could be construed as representations to the public by petitioner that it had dedicated its public utility service to the entire area of the Victorine Ranch or that it would extend its service to that new area whenever requested. His testimony does not support the commission's finding that petitioner has dedicated its service to the public in the balance of the Victorine Ranch area. Nor is any other evidence cited which can support such finding.

 This is a situation wherein Sawyer, *as a private individual businessman*, desired, negotiated for, and obtained, a conditioned or provisional obligation running from petitioner *to Sawyer as an individual*, as distinguished from a member of the public. The most that can be deduced from the dealings between petitioner and Sawyer is that petitioner has conditionally obligated itself to Sawyer as an individual subdivider, to obligate itself to the public in the future when

and if the specified conditions precedent have been met. And such conditions have not been met.

 Of course, an actual rendition of public utility service to only a restricted class or eligible segment of the public may be held to constitute a dedication of service to the public. (*Camp Rincon Resort Co.* v. *Eshleman* (1916), *supra*, 172 Cal. 561, 564; see *Commercial Communications, Inc.* v. *Public Util. Com.* (1958), 50 Cal.2d 512, 523 [13] [327 P.2d 513].) Section 207 of the Public Utilities Code defines "Public or any portion thereof" as "the public generally, or any limited portion of the public, including a person . . . for which the service is performed or to which the commodity is delivered." In the present case, however, Sawyer has not sought, *much less received,* actual water deliveries to himself for his own use upon the balance of the Victorine Ranch property. He does not appear interested in himself receiving and paying for water deliveries. What he has sought and what he has received is a conditioned contractual obligation running to himself, not as a water consumer, but as a private individual engaged in the business of subdividing uninhabited land.

 The commission has relied upon the mere existence of that conditioned and provisional obligation, running to Sawyer as an individual private businessman—who has never met the conditions precedent—as evidence that petitioner obligated itself to "the public"—an unidentified and intangible public—to provide service in an as yet uninhabited area. Such a view is untenable. It follows that the evidence fails to support the finding of dedication and that the order under review must be annulled.

Petitioner further contends that the commission had no jurisdiction whatsoever over the terms and conditions upon which a water public utility may voluntarily agree to extend its mains into nondedicated territory. Petitioner concedes the commission's jurisdiction over the rates which may be charged for actual water delivery once the mains have been extended and service commenced, but urges that the commission's jurisdiction does not attach until such time as water is actually delivered to consumers; that a water public utility may agree to extend its mains into previously nondedicated territory upon whatever terms and conditions it pleases. The commission contends that when a water public utility undertakes to extend its mains beyond its dedicated area it must do so on the terms and conditions stated in its main extension rule on file with the commission, or obtain commission authority

for any arrangements which deviate therefrom; that until the commission approves provisions deviating from the utility's main extension rule, such provisions are of no force or effect.

Petitioner argues that its main extension rule is applicable only to extensions *within* its dedicated service area; that when it contracts to extend its mains to an area wherein it is under no obligation to the public to serve, it does so as a private corporation free from regulation by the Public Utilities Commission. Petitioner relies on section 1001 of the Public Utilities Code which provides: "No . . . water corporation shall begin the construction . . . of a line, plant, or system, or of any extension thereof, without having first obtained from the commission a certificate [of public convenience and necessity] . . .

"This article shall not be construed to require any such corporation to secure such certificate for an extension . . . into territory . . . contiguous to its . . . line, plant, or system, and not theretofore served by a public utility of like character . . ."

 Nothing in section 1001 indicates that a water utility is free from all regulation when it contracts to extend its mains beyond its dedicated service area. The commission seeks to apply and enforce that part of its General Order Number 96 which states that no public utility such as petitioner "shall hereafter make effective any contract or arrangement for the furnishing of any public utility service . . . under conditions other than the . . . conditions contained in its tariff schedules on file and in effect at the time, unless it first obtains the authorization of the Commission to carry out the terms of such contract or arrangement." As authority for its promulgation of the quoted portion of General Order Number 96, the commission relies on section 532 of the Public Utilities Code which provides that "no public utility shall charge, or receive a different compensation for any product or commodity furnished or to be furnished, or for any service rendered or to be rendered than the . . . charges applicable thereto as specified in its schedules on file and in effect at the time. . . . The commission may by rule or order establish such exceptions from the operation of this prohibition as it may consider just and reasonable as to each public utility."

Petitioner contends that a water utility cannot be considered to have dedicated its service to the public in a pre-

viously nondedicated area until water is actually delivered in that area; that the commission's jurisdiction to regulate terms and conditions of service does not attach until such time as water is actually delivered; and that therefore the commission has no jurisdiction whatsoever over the compensation charged for the extension of a water utility's mains preparatory to the commencement of actual water deliveries. In other words, petitioner concedes that section 532 is applicable insofar as compensation charged for actual water deliveries is concerned, but contends that the section is inapplicable with respect to the compensation charged for the main extensions which make such water deliveries possible.

But regulation of compensation charged for actual water deliveries could be substantially inadequate to protect the public interest if public utilities were free from all regulation with respect to the compensation charged for the main extensions which make such water deliveries possible. The extension of a water utility's mains in preparation for the actual delivery of water is no less a public utility service than the water deliveries themselves. The cost of installing mains for the delivery of water is a part of the cost of the water deliveries. Petitioner's position on this issue is not tenable. Various cases from other jurisdictions cited by petitioner do not involve statutory schemes of regulation akin to that in California, and are not in point.

We conclude that section 532 of the Public Utilities Code fully supports the commission's position that when a water public utility undertakes to extend its mains beyond its dedicated area it may do so only on the terms and conditions stated in its main extension rule on file with the commission, and must obtain commission authority for any arrangements which deviate therefrom; that until provisions deviating from the utility's main extension rule are approved by the commission, they are of no force or effect. The commission may properly regulate the terms on which extensions into new areas may be voluntarily made and it may regulate the service which must be given within an area to which the utility is dedicated. But this is not to say that the commission may compel a water utility to extend its mains into a wholly new proposed residential community to be created by a subdivision in nondedicated territory, on terms other than those agreed to by the utility. It cannot. Neither may the commission accomplish that result by itself proposing the terms on which the utility will contract to enter a

new territory, order the utility to enter into such a contract, and then compel it to specifically perform that contract.

The order under review is annulled.

Shenk, J., Carter, J., Spence, J., and McComb, J., concurred.

GIBSON, C. J.—I dissent.

I am of the view that the commission's finding that there was a dedication of service by the company with respect to the Victorine Ranch property is supported as to all portions of the ranch other than the part above the 600-foot contour. It is not disputed that, if there was such a dedication, the commission has authority to order the company to extend service to the dedicated area when such service becomes necessary. The order of the commission should be affirmed, with the possible exception of certain provisions discussed hereinafter relating to the form of the order.

In considering the propriety of the commission's order we must keep in mind the rule that the Public Utilities Commission is a statewide agency which derives adjudicating power from the Constitution (Cal. Const., art. XII, § 22) and that its factual determinations, for example, those of public convenience and necessity and of reasonableness, are not subject to re-examination in a trial de novo but must be upheld by a reviewing court if they are supported by substantial evidence. (*Southern Pac. Co.* v. *Public Utilities Com.*, 41 Cal.2d 354, 362, 367 [260 P.2d 70]; *Pacific Greyhound Lines* v. *Railroad Com.*, 11 Cal.2d 427, 429 [80 P.2d 971]; see *California Portland Cement Co.* v. *Public Util. Com.*, 49 Cal.2d 171, 175, 176 [315 P.2d 709]; *cf. Shepherd* v. *State Personnel Board*, 48 Cal.2d 41, 46 [307 P.2d 4].)

The water company admits that in 1948 its territory of dedicated service extended south to the southern boundary of Carmel Highlands. In that year respondent Sawyer purchased the Victorine Ranch which contained 1,146 acres of land lying immediately south of Carmel Highlands. After receiving letters from an officer of the water company to the effect that its installations could be extended to the ranch with storage tanks that would supply any development that might be contemplated in this area, Sawyer subdivided 23 acres, herein referred to as Tract Number 1, installed a water distribution system therein, and constructed an 8-inch water main to connect with the company's 3-inch main some 400 feet north of the southern boundary of Carmel Highlands.

In July 1949 the parties signed an agreement which provided for the transfer to the water company, without obligation to refund, of the 8-inch pipeline and the distribution system in Tract Number 1. The agreement provided in part as follows: The company, within five days, was to connect its 3-inch main with the 8-inch main and, within 60 days, to apply to the Public Utilities Commission for a certificate of public convenience and necessity "to render water service as a public utility in that portion of said Victorine Ranch lying below the 600 foot contour." Sawyer agreed to pay the company the cost of installing an 8-inch pipeline running some 5,000 feet to connect the one previously built by Sawyer with an existing 8-inch pipe of the water company. He was to create a fund of $20,000 toward this purpose, the fund to be turned over to the company upon the construction of ten homes in Tract Number 1 or in the event Sawyer should subdivide an additional portion of the main tract. The company agreed "to extend its facilities to other portions of said tract lying below the 600 foot contour in accordance with Published Rule and Regulation 19B of Company," provided such additional areas were developed in units of not less than five acres. With respect to the portion of the ranch lying above the 600-foot contour, the company agreed to supply water under terms and conditions acceptable to it, but the contract provided that the company should be under no obligation to serve that area if Sawyer and the company were unable to agree on reasonable terms. It was further provided that the services to be rendered by the company and the rates to be charged should be subject to such rules and regulations as were or should be established by the Public Utilities Commission and that the agreement should be subject to such changes and modifications as the commission might direct in the exercise of its jurisdiction.

The company's rule 19B referred to above, filed with the commission, provided that applicants for extensions of mains to serve tracts and subdivisions should pay the construction costs of the necessary facilities with certain minor exceptions and should receive from the company, for a period of not to exceed ten years, an annual refund of 35 per cent of the gross revenue collected from consumers within the subdivision. It thus appears that the 1949 agreement was more favorable to the company than its rule on file with the commission with respect to who should pay the costs of the 8-inch main already

built by Sawyer, the contemplated 5,000-foot pipeline, and the distribution system for Tract Number 1.

Following execution of the July 1949 agreement, the company connected its 3-inch main with the 8-inch main built by Sawyer and commenced service to Tract Number 1. The company concedes that Tract No. 1 thereby became a part of its dedicated public service area.

The company, however, failed to comply with its unconditional promise, under the 1949 agreement, to apply within 60 days to the Public Utilities Commission for a certificate of public convenience and necessity "to render water service as a public utility in that portion of said Victorine Ranch lying below the 600 foot contour." Moreover, the company did not comply with paragraph X of General Order Number 96 of the commission which, in accord with section 532 of the Public Utilities Code, declares that a water company cannot make effective any contract for furnishing public utility service under conditions other than those contained in its schedules on file with the commission (in this case, rule 19B of the company) unless it obtains commission authority for any arrangements which deviate therefrom. Here, as we have seen, the 1949 agreement contained several departures, favorable to the company, from its rule 19B, and these departures, under the law, could not be made effective without approval. The company thus violated the law when it put the 1949 agreement into effect, without commission approval, by proceeding into a portion of the ranch area, namely, Tract Number 1.

In view of the fact that the company proceeded into a portion of the ranch area, commenced service, and operated there for a period of several years, at all times purporting to act under the 1949 agreement, there was clearly a dedication by the company to furnish water to the area, at least in accordance with the terms and conditions of that agreement. One of these terms, and a part of the consideration due to Sawyer, was the unconditional promise of the company to seek within 60 days a certificate of public convenience and necessity with respect to the entire ranch below the 600-foot contour, and the extent of the dedication must be measured by this term of the agreement, which cannot properly be severed from the remainder of the contract. In the analogous case of *Lukrawka* v. *Spring Valley Water Co.,* 169 Cal. 318, 324 et seq. [146 P. 640, Ann.Cas. 1916D 277], a water company, organized under a statute permitting the formation of corporations to supply

water to a city or town, had commenced service to part of San Francisco. It was held that the company, by proceeding under the statute and accepting the statutory franchise which was applicable to the whole city, dedicated its service to the entire city. Although in the present case there is no franchise to show the boundaries of the land to be served, the extent of the area of dedication is clearly indicated by the provisions of the 1949 contract under which the company obligated itself to apply for a certificate of public convenience and necessity as to all portions of the ranch below the 600-foot contour.

The 1949 contract is not, as asserted by the majority opinion, merely a conditioned or provisional obligation upon the part of the company to obligate itself in the future. The existence of the agreement itself is unconditional, and the company's promise to apply for a certificate is likewise unconditional. While the contract by implication makes certain acts by Sawyer conditions precedent to performance by the company of its obligation to serve the portions of the ranch outside of Tract No. 1 in accordance with rule 19B, such conditions would merely affect the time for performance of those duties and do not excuse the company's failure to perform its unconditional promises nor operate to terminate the completed dedication. If the company in 1949 had performed its duty to apply for such a certificate and for approval of the terms and conditions of the contract which departed from its rule 19B, and if the commission had granted those requests and had approved the contract, there obviously would have been a completed dedication of service to the entire ranch below the 600-foot contour. Under such circumstances the commission would have had authority to order the company to render service to the area, upon performance by Sawyer of his obligations under the 1949 agreement, giving Sawyer a reasonable time for performance upon his part within the meaning of the contractual provisions. The company should not be permitted to rely either on the fact that it breached its agreement by failing to apply for the certificate or on the fact that it violated the law by putting the contract into effect without first obtaining commission approval.

The foregoing conclusions are not affected by the fact that in 1956 the company, Sawyer, and a purchaser of a part of the ranch property entered into a compromise agreement which expressly provided that it should have no force and effect until dismissal of Sawyer's complaint and unqualified

approval by the commission of the 1949 agreement as modified by the compromise. The 1956 compromise adopted, with certain amendments, the provisions of the 1949 agreement relating to the extension of service to all the ranch below the 600-foot contour but was conditioned upon dismissal of the complaint and unqualified approval by the commission of all the terms of the 1949 agreement as amended by the compromise. The 1956 compromise indicates at least a conditional intent upon the part of the company to dedicate its services to all portions of the ranch below the 600-foot contour, and, in any event, it is clear that the 1956 agreement discloses no desire upon the part of the company to depart from its announced intent, as declared in the 1949 agreement, to extend service to all portions of the ranch below the 600-foot contour. Although the 1956 compromise, standing alone, would not be sufficient to show a dedication, in view of the fact that it was conditioned upon an approval which was never obtained, this is immaterial because, as we have seen, there was a completed dedication of service to the whole ranch below the 600-foot line as a result of the 1949 agreement and the action of the company pursuant thereto in commencing service to part of the ranch.

Under the circumstances of this case the commission, in addition to concluding that the company had dedicated its services to all the ranch property below the 600-foot contour, could also order the company to render service upon terms different from the conditions set forth in the 1949 contract, and the commission was not required to make a choice between accepting or rejecting the agreement as an entirety. As the majority opinion recognizes, the commission may properly regulate the service which must be given in an area to which the utility is dedicated and the terms on which extensions into new areas may be made, and any arrangements made by the utility which deviate from its rules on file with the commission, unless approved by the commission, are of no force and effect. (Pub. Util. Code, § 532; Paragraph X of General Order No. 96 of the commission.) When the company put into effect the 1949 agreement by extending service thereunder to a portion of the ranch area, without complying with its promise to seek a certificate of public convenience and necessity and in violation of the order requiring commission approval of deviations from the company's filed rules, it was bound to know that it acted at its peril. The company thus assumed the risk that the commission would subsequently conclude that the company had dedicated its services to the entire

area as delineated by the promises under which it purported to act, that the company could be ordered to render service within the area under reasonable regulations, and that such contract terms as were not acceptable to the commission could be disregarded.

Any other conclusion would be very unfair to Sawyer and other persons interested in the ranch property, would give the company benefits to which it was not entitled, and would permit the company to circumvent the law requiring commission approval of extensions of service upon terms different from the company's filed rules. The company purportedly acted under the 1949 contract when it entered into the ranch property, began to serve a portion of it, and continued that service during the intervening years to the date of this proceeding. Sawyer and other persons interested in the ranch property clearly had a right to rely upon the fact that the company, by its conduct, indicated that it intended to fulfill the obligations which it had undertaken in 1949, including the unconditional, express promise to apply for a certificate of public convenience and necessity to serve the entire ranch property below the 600-foot contour and the implied in law promise to seek commission approval of the arrangements. In view of all the circumstances, including the contract and the fact that the company was at all times aware of Sawyer's plans to continue subdividing the land, the commission could reasonably conclude that it would be unfair to permit the company, at this late date, to be released from its agreement to apply for permission to serve the entire area. Moreover, it should be noted, in this connection, that the commission could reasonably consider the possibility that, for purposes of economy of operation and public convenience, only one water utility should serve the entire ranch area, that the company's entry into a portion of the area made it impossible for any other utility to perform such unit service unless the company was forced to withdraw, and that, since the company had entered Tract Number 1 under nonapproved conditions but pursuant to its agreement to extend service to the balance of the ranch, the company should be required to serve the portions outside Tract Number 1 as a condition to applying in Tract Number 1 terms of service which depart from rule 19B.

Contrary to the position taken by the majority opinion the order of the commission, when properly construed, concerns the terms of the company's service to Tract Number 1

and does not relate solely to the company's obligation to serve other areas of the ranch. The terms of extension of the company's service to Tract Number 1, under the 1949 agreement, obviously include the various promises of Sawyer and the company with regard to construction of pipelines, payment therefor, connections with the company's system, and transfer of Sawyer's 8-inch main and distribution system to the company. These promises clearly related to, and were parts of the consideration for, the company's agreement to enter Tract Number 1 as well as for its agreement to apply for a certificate as to other portions of the ranch. Thus, when the commission, by its order, prescribed terms other than those fixed by the 1949 agreement for construction of and payment for pipelines, it was in effect altering the terms of extending service to Tract Number 1 as well as to the remaining property. The majority opinion does not discuss the right of the commission under General Order Number 96 and the undisputed facts of this case to order the company to revise the unapproved terms upon which it entered Tract Number 1 in 1949 or, as an alternative, to withdraw from that tract. If the commission were not permitted to make such an order, any company could ignore the commission, flout the rules discussed above, and establish service on its own exorbitant terms by simply entering a tract and commencing service under private arrangements without obtaining commission approval.

I find no merit in that portion of the majority opinion which appears to argue that there has been no dedication of service to the ranch area outside of Tract Number 1 because, it is asserted, "Sawyer has not sought, *much less received,* actual water deliveries to himself for his own use" upon this portion of the ranch but, rather, has sought an "obligation running to himself, not as a water consumer, but as a private individual engaged in the business of subdividing uninhabited land." Under the evidence presented here the commission could reasonably conclude that in 1949 Sawyer, to the knowledge of the company, was planning to subdivide the entire ranch property and that the 1949 contract was made in order to assure a water supply for the subdivided area. Unquestionably this was true with respect to Tract Number 1, and the agreement and the other circumstances discussed above are sufficient to justify a similar conclusion with respect to the remainder of the ranch. The use of a contract of this type, subject to approval of the commission, is clearly an appropriate method for a subdivider and a water company to employ

for the purpose of establishing for the subdivider, in advance of actual construction, the necessary water supply for his tracts, and it would be wholly unreasonable to require that he receive some of the water for his personal use or that he obtain the signatures of prospective home owners, who are probably unknown to him. The implied finding of the commission that the parties to the agreement contemplated and arranged for service by the company to the public, as distinguished from some private contractual service which would not come within the jurisdiction of the commission, is likewise supported by the provision of the 1949 agreement requiring the company to apply for a certificate of convenience and necessity with respect to the remainder of the ranch property. As we have seen, the factual determinations of the commission, under its constitutional powers, are not subject to re-examination in a trial de novo and must be upheld by this court if they are supported by substantial evidence.

The finding of the commission is that there had been a dedication of service to the balance of the ranch, but the only provision in the contract relating to service above the 600-foot contour is that the company should not be under any obligation to serve that area unless it was able to agree with Sawyer on reasonable terms. There was merely an agreement to agree in the future, which is not sufficient to show a clear intent to dedicate service to the area above 600 feet. However, the portion of the finding as to the upper area is severable, and the deficiency of evidence does not require any modification of the commission's order since it does not direct that any action be taken with reference to the land above the 600-foot contour.

It is not necessary in this dissent to discuss the power of the commission to compel a utility to extend its mains into a wholly new and nondedicated area on terms other than those agreed to by the utility.

In view of the holding of the majority opinion it is likewise unnecessary for this dissent to consider, with respect to the form of the commission's order, whether the company can properly be ordered to ''modify'' or ''re-execute'' or ''perform'' its 1949 contract as amended. The commission, nevertheless, has the power, as the majority opinion recognizes, to order a public utility to render certain services on certain terms and conditions, and, in so doing, it is not bound by the company's previously negotiated contracts. It would

be a minor matter to correct, or direct the commission to correct, any technical errors of this type in its order.

In my opinion the order of the commission should be affirmed, except insofar as concerns the possible technical errors referred to above.

Traynor, J., concurred.

The petition of respondent Public Utilities Commission for a rehearing was denied March 4, 1959. Gibson, C. J., and Traynor, J., were of the opinion that the petition should be granted.